[Argued November 20; decided December 26, 1893.]

## LEWIS *v.* CITY OF PORTLAND.

[S. C. 35 Pac. 256; 22 L. R. A. 736.]

1. Dedication of Street — Donation Land Law.—A dedication for a street of a strip of the public domain, made before the passage of the donation law, is not binding on one who subsequently, under such law, acquires title to a tract containing the strip so dedicated.

2. Dedication of Streets by Reference to Maps or Plats — Estoppel.— An owner of a tract of land is not estopped from denying that a certain strip of land is a street merely because he deeded lots in said tract by reference to the name under which the tract was platted, and a lithographic map in general circulation in that community showed the strip in question to be a street, where it appears that there were several maps of the addition, and it is not shown that the owner ever knew of or recognized the lithographic map.[1]

3. Idem.— Where an owner of a tract of land, having platted part of it, showing that a certain strip is not a street, afterwards files a plat of an addition to his first plat, and for the purpose of showing its position relative to the land before platted, extends in blank, without names or numbers, the blocks and streets of the first plat, and on this blank extension shows the same strip of land to be a street, he does not dedicate such strip for a street, since the dedication on the second map is only of the new land thereon platted.

4. Dedication of Street — Intention — User.— A dedication of land to public use rests entirely on the intent or assent of the owner, and when the evidence of it rests in parol it must be of such a deliberate and decisive character as to leave no doubt of the owner's intention. *Hogue* v. *Albina*, 20 Or. 185, cited and approved.

5. Evidence of Dedication by User.[2]—Though a passage way to a wharf was used by the public without objection for over twenty years, such fact does not show a dedication by user, where the owner always claimed to own the way, maintained a gate at the mouth of it part of

---

[1] Note.—This same question was similarly decided in the case of *Sullivan* v. *Davis*, 29 Kan. pp. 31–33, though it was there shown that the owners of the land were well aware of the existence and general use of the lithographic map, and of the fact that the land in question appeared thereon as having been platted, when, in fact, it was still acreage.— Reporter.

[2] Note.— The question of dedication by either permissive or adverse use is discussed but not decided in *Smith* v. *Gardner*, 12 Or. 221.— Reporter.

the time, improved it, and kept it in repair, and exercised general control over it.

6. TITLE OF THE STATE TO TIDE AND SUBMERGED LANDS.[1]— On the admission of Oregon into the union the tide lands, and submerged lands lying between the upland and navigable waters in the fresh-water rivers of the state, became its property, and subject to its jurisdiction and disposal; and the state has the right to use or dispose of its title in any manner it may choose, free from any easement of the upland owners therein except such as the state may choose to allow them, and subject always to the paramount right of navigation, and the uses of commerce. *Bowlby* v. *Shively*, 22 Or. 410, approved and followed.

7. RIGHTS OF RIPARIAN PROPRIETORS ON NAVIGABLE STREAMS — SUBMERGED LANDS — WHARF RIGHTS.— In view of the fact that the state has provided for the sale of its tide lands, but has not legislated on the subject of submerged lands lying between the uplands and the navigable waters of the rivers of the state, and that the act of October twenty-first, eighteen hundred and seventy-six ( Laws, 1876, p. 70 ), grants to the upland owners the tide or overflowed land adjacent to such upland on the Coos, Coquille, and Willamette Rivers, and in view of the further fact that the custom has always prevailed in this state, and without legislative interference, for the upland owner to wharf out in front of his property to navigable water, and in view of the tendency of the decisions of the courts as shown in *Minto*

---

[1] NOTE.— The entire field of authorities relating to the question of the title to submerged lands in fresh-water navigable rivers has been thoroughly and exhaustively explored by Mr. Justice GRAY in the case or *Shively* v. *Bowlby,* — U. S. —, 14 Sup. Ct. Rep. 548, affirming the decision of Mr. Justice LORD, reported in 22 Or. 410. In introducing the question, the court says: "The briefs submitted in the case at bar have been so able and elaborate, and have disclosed such a diversity of view as to the scope and effect of the previous decisions of this court upon the subject of public and private rights in lands below high-water mark of navigable waters, that this appears to the court to be a fit occasion for a full review of those decisions, and a consideration of other authorities upon the subject." The cases of *Shively* v. *Bowlby,* 152 U. S. 1, and the following, with the elaborate notes attached to them, contain substantially all the law relating to the wharf rights of riparian owners in the absence of constitutional or statutory regulations or prohibitions. *Parker* v. *West Coast Packing Co.* 5 L. R. A. 61, 17 Or. 510; *Miller* v. *Mendenhall,* 19 Am. St. Rep. 219, 8 L. R. A. 89, 43 Minn. 95 ; *Hastings* v. *Grimshaw* ( Mass.), 12 L. R. A. 617 ; *Prior* v. *Swartz,* 36 Am. St. Rep. 333, 18 L. R. A. 668, 62 Conn. 132.

*Eisenbach* v. *Hatfield,* 12 L. R. A. 617, 2 Wash. 236, clearly shows the difference between the cases decided in states where the riparian rights have been settled by legislation, as in Washington, and those in states where the matter is left open to be settled on common-law principles, as in Oregon.— REPORTER.

v. *Delaney,* 7 Or. 337, and *Parker* v. *Rogers,* 8 Or. 190, to recognize in riparian owners on the navigable rivers rights in submerged lands that do not belong to the public generally, the court feels justified in holding that riparian proprietors on the navigable rivers of the state who have built wharves out to navigable water in front of their upland have rights of private property therein that cannot be taken for public use except after due compensation being made therefor in the manner established by law.

8. RIPARIAN PROPRIETORS — WHARF RIGHTS UNDER SECTION 4227, HILL'S CODE — CONSTITUTIONAL LAW.— The object of section 4227, Hill's Code, which authorizes the owners of land lying upon navigable streams, and within the limits of incorporated cities to construct wharves thereon, and extend them out to navigable water, being to encourage the building of wharves in aid of navigation and commerce, riparian owners on navigable streams, who, before the passage of the section, had built wharves on such upland, acquired, within the spirit and intent of said section, property in such wharves which cannot be taken for public use without just compensation.

9. VESTED RIGHTS IN WHARVES ON NAVIGABLE STREAMS — CONSTITUTIONAL LAW.— Riparian owners who have built wharves out to the navigable waters of fresh-water streams, with the implied license and permission of the state, and within the spirit and intent of section 4227, Hill's Code, giving to upland proprietors on navigable streams, and within the limits of any incorporated city, the right to build wharves in front of their holdings out to navigable water, have acquired vested rights in such wharf properties that cannot be taken for public use without compensation.[1]

APPEAL from Multnomah: HARTWELL HURLEY, Judge.

This is a suit in equity brought by Cicero H. Lewis, Henry F. Allen, partners as Allen & Lewis, and Mary H. Couch, Geo. H. Flanders, and W. S. Ladd against the City of Portland and others and to restrain them from appropriating to public use without compensation to the owners thereof a strip of land at the foot of Burnside Street in said city. The complaint, *inter alia,* alleges that the

---

[1] NOTE.— That riparian rights and wharf privileges are property which cannot be taken away without compensation is shown in the case of *Rumsey* v. *New York & New Eng. Ry. Co.* 133 N. Y. 79, 28 Am. St. Rep. 600, 15 L. R. A. 618; *City of Janesville* v. *Carpenter,* 77 Wis. 288, 20 Am. St. Rep. 123.— REPORTER.

plaintiffs are the owners in fee simple and in possession
of certain lots therein described, having adjacent thereto
several warehouses, and are also the owners in fee of a
strip of land at the foot of Burnside Street, sixty feet
wide, between Front Street and the Willamette River,
and of the wharf located thereon extending to the navi-
gable water of such river; that the defendants C. H.
Meussdorffer, M. C. George, W. M. Ladd, J. L. Sperry, E.
A. King, C. C. Redman, John Parker, and T. W. Pit-
tinger constituting the bridge commission appointed and
acting under the "Meussdorffer Act" (Laws, 1891, p. 634),
propose to construct a bridge across the Willamette River
from the intersection of Burnside and North Front Streets
in the city of Portland, to a point opposite thereto on the
east bank of said river, and have let the contract therefor
to the defendant, the Bullen Bridge Company, which
company is about to commence the work of its construc-
tion; that the defendants propose to place the approach
to and abutment for the west end of such bridge upon
said strip of land, and to appropriate the same to public
use, without any compensation to its owners, and with-
out taking any steps to acquire the title, or any right to
occupy, or use said land and, that, unless restrained, they
will proceed with the construction of said bridge, and
wholly deprive the plaintiffs of their property without
compensation therefor, and also permanently obstruct the
use of said wharf, and the extensions thereof north and
south of the proposed site of said bridge to their great
and irreparable injury.

The answer denies, on information and belief, that the
plaintiffs are the owners of said property, and affirmatively
alleges as a defense (1) that the strip of land in contro-
versy is a part of Burnside Street by virtue of a dedication
under certain maps and plats made and filed by John H.
Couch between the years of eighteen hundred and fifty-

nine and eighteen hundred and sixty-nine, showing the
extension of said street to the Willamette River; that the
said John H. Couch, his wife Caroline, and these plain-
tiffs, exhibited the same to intending purchasers, and
sold lots and blocks with special reference to such maps
and plats; that the *locus in quo* is a part of the wife's half
of the John H. Couch donation land claim, and that his
wife, Caroline Couch, after his death, and the plaintiffs
after her death, sold and conveyed to divers persons sun-
dry lots and blocks and parts thereof with particular ref-
erence to said plats and maps, and thereby approved and
ratified the act of John H. Couch in making and filing
the same:    And alleges (2) as a further defense that the
*locus in quo* has been constantly used by the public as a
street for more than twenty years last past, with the
knowledge and consent of the plaintiffs, their ancestors,
predecessors, and grantors, and that the public thereby
acquired a prescriptive right to use and occupy the same
as a street.    The reply denies the allegations in the
answer, except that the *locus in quo* is in that half of the
donation land claim set apart to Caroline Couch, etc.
From this statement it will be seen that the main ques-
tions involved and to be determined are:    (1) Has there
been a dedication of the *locus in quo* as a public street?
(2) Have the plaintiffs a right to erect and maintain at
the *locus in quo* a wharf extending to the navigable water
of the Willamette River?

At the trial it was stipulated, *inter alia:*    1. That the
land in controversy is situated within the corporate limits
of the city of Portland, Oregon, and is a part of the wife's
half of the donation land claim of John H. Couch and Caro-
line Couch, his wife.    2. That John H. Couch died in Jan-
uary, eighteen hundred and seventy, and Caroline Couch
in July, eighteen hundred and eighty-five.    3. That
plaintiffs are the owners of the land in controversy and

running to high-water mark in the Willamette River, unless it shall be found that said land is a public street. 4. That on the nineteenth day of January, eighteen hundred and sixty-five, the said John H. Couch filed in the clerk's office of the county of Multnomah for record, a map purporting to be a map of Couch's Addition to the city of Portland, and purporting to dedicate the streets and alleys marked thereon to the use of the public, which map comprised a plat of land included wholly within the limits of Caroline Couch's half of said donation land claim. A copy of said map is attached and marked exhibit "A." 5. That on the twenty-second day of June, eighteen hundred and sixty-nine, the said John H. Couch filed in the said clerk's office for record a map designated theron as a map of an extension to Couch's Addition to the city of Portland, comprising a part of land partly within said Caroline H. Couch's half of said claim and partly within John H. Couch's, a copy of which map and the writings thereon are attached and marked exhibit "D." 6. That John H. Couch filed in the year eighteen hundred and sixty-nine, a map purporting to be a map of an extension of Couch's Addition, and that lots and blocks or parts thereof embraced in said extension were sold by John H. Couch and wife to various persons between the date of the filing of said plat and the plat subsequently filed by Caroline Couch and the heirs of John H. Couch, on the —— day of November, eighteen hundred and seventy-two, plaintiff, however, not waiving proof of the sale of any lots or blocks on said Burnside Street between said dates. 7. That on the sixteenth day of November, eighteen hundred and seventy-two, Caroline Couch, the widow, and —— heirs of said John H. and Caroline Couch, filed a map in said clerk's office for record, purporting to be a map of Couch's Addition to the city of Portland, and purporting to dedicate the streets

marked thereon to the use of the public, which map comprised land partly said Caroline's half of said claim, and which map is attached and marked exhibit "C."

It was also stipulated that after June fifteenth, eighteen hundred and seventy-two, the widow and heirs of John H. Couch conveyed sundry lots and blocks shown on said maps, describing them as being "in John H. Couch's Addition to the city of Portland * * * according to the maps and plats of said Couch's Addition," and that some of the property so conveyed first appeared as lots on the map of eighteen hundred and sixty-nine, exhibit "D"; and further that between eighteen hundred and fifty-nine and eighteen hundred and sixty-nine, Captain Couch and wife signed and delivered to purchasers of lots in said tract a number of deeds wherein the property conveyed was similarly described.

The testimony having been taken before Francis D. Chamberlain, Esq., special referee, the questions involved were elaborately argued before Judge Hurley, who rendered an extended written opinion fully sustaining the claims of the plaintiffs, and granting an injunction as prayed for, from which defendants appeal.

AFFIRMED.

*Messrs. Jarvis V. Beach,* corporation counsel, and *Martin L. Pipes ( Messrs. John W. Whalley* and *Reuben S. Strahan* on the brief), for Appellants.

*Evidence of Dedication.*— It is undisputed, that the predecessors of the Couch heirs, plaintiffs here, claiming to own the south half of the disputed tract, executed deeds to various persons, conveying lots and blocks in Couch's Addition to the city of Portland, "according to the maps or plats of such addition," at different times, from eighteen hundred and fifty to eighteen hundred and and fifty-nine. During that time no map or plat of such

addition was on file or record among the records of the county. The map referred to in the deeds was a private map. Such a map was referred to in a deed exhibited to the court on the hearing, which map was made on April twenty-third, eighteen hundred and fifty. That map, having been made before the donation law was passed, would not of itself amount to a dedication, but deeds made with reference to it after that law was passed and after the Couchs got title to the land would amount to a dedication. We have made a *prima facie* case that this private map did dedicate the disputed tract as a street. We offer a lithographic copy of a map showing such dedication, made in eighteen hundred and fifty-nine, and in general use in this city, and that it was the only map in general use in the city. That map purports to be compiled from other maps. It is itself more than thirty years old and entitled to the presumptions of an ancient document. This evidence authorizes the inference that it is a correct copy of the private map to which we have referred. The inference is disputable, certainly, but the burden is upon the other side to dispute the inference by producing their private map or showing its loss. We prove that deeds were made by the Couchs from eighteen hundred and fifty-nine to eighteen hundred and sixty-five, the time when this lithographic map was the only public map, referring to maps of the said addition. At that time no map had been filed or recorded. This is a recognition of the public map, and that the deeds mentioned were made with reference to it and that this map is itself a dedication.

If we are correct in the foregoing, then neither the map of eighteen hundred and sixty-five nor the map of eighteen hundred and seventy-two could close this street; the dedication had been made and accepted, and was irrevocable. But the map of eighteen hundred and

sixty-nine shows clearly a dedication of this street. Its effect is two-fold: (*a*) It is evidence tending to show that the maps used prior thereto opened the street to the river, because it purports, as counsel for plaintiffs agree, to be an outline copy of a preëxisting map. It is fair to presume that it was a copy of the map of eighteen hundred and fifty or of the lithographic map of eighteen hundred and fifty-nine. So far, then, it corroborates our evidence and contention as to those earlier maps. (*b*) But this map of eighteen hundred and sixty-nine, and the deeds made with reference to it, contribute in themselves a dedication. The deeds were made by all the plaintiffs claiming this land except Mr. Allen. The deeds necessarily referred to this map, because they conveyed lots and blocks that appear on no other map. The only answer to this is that the outline part of the map was only intended to show the relation of the new block to the old addition. Granted. That includes the statement that it was intended to show to intending purchasers of the new blocks that there were streets in the old addition; that the extension was connected with the system of streets of the old addition; that the purchasers would have the advantage of the streets marked on that outline part of the map; that the whole plat, old and new, constituted one addition. The outline map was drawn to exhibit an advantage to the extension by reason of the streets shown on it. Then every street was exhibited thereon for that purpose, B Street to the river, as well as the rest. If this map was not to have that effect, what was that street shown for on that outline map?

As further corroborating the foregoing evidence of dedication, we confidently refer to the whole oral evidence in the case. It clearly appears that the street has been thrown open to the public for forty years. It has been used just as other streets similarly situated have

been used. None of the acts, as the storing of iron, or the keeping of a gate at the entrance of the wharf, relied on by plaintiffs, are inconsistent with the public use. In any view, they were too slight, too infrequent, and too inconsequential to be considered. Plaintiffs admit that the public was invited over that way during all these years. By their own act the plaintiffs made this parcel of ground a part of their public business, and impressed upon it the stamp of publicity, just as completely as they could have done by an express statutory dedication. Is not forty years of continuous use by the public sufficient? *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77; Elliott, Roads and Streets, 125; 2 Dill. Mun. Corp. 631, 2 Greenl. Ev. §§ 537–546.

A conveyance by the owner with reference to a plat or map dedicates all the streets shown thereon irrevocably: *Lownsdale* v. *Portland,* 1 Or. 397, 5 Am. & Eng. Enc. Law, 405, and notes; *Florentine* v. *Barton,* 69 U. S. 2 Wall. 57, 17 L. Ed. 783; *Portland* v. *Whittle,* 3 Or. 126; *Carter* v̇. *Portland,* 4 Or. 339.

If the owner open the street and the public use it, it is enough to dedicate: *Woodyer* v. *Hadden,* 5 Taunt. 125; *Chapin* v. *State,* 24 Conn. 236; *Green* v. *Oakes,* 17 Ill. 249; *Connehan* v. *Ford,* 9 Wis. 240.

From the use by the public with the assent of the owner, the law presumes a dedication: *Macon* v. *Franklin,* 12 Ga. 239; *Eastman* v. *Lamprey,* 12 Minn. 89; *Cady* v. *Conger,* 19 N. Y. 256.

*Right to Maintain the Wharf.* — This state owns the bed of all navigable rivers, and of all bays, inlets, and estuaries within her borders, by virtue of her sovereignty: *Eisenbach* v. *Hatfield,* 12 L. R. A. 632, *et seq.,* 2 Wash. 236; *Weber* v. *State Harbor Comrs.* 85 U. S. 18 Wall. 65, 21 L. Ed. 802; *Hardin* v. *Jordan,* 140 U. S. 376, 35 L. Ed. 431, 32 Cent. L. J. 297; *McManus* v. *Carmichael,* 3 Iowa, 1; *Barney*

v. *Keokuk*, 94 U. S. 338, 24 L. Ed. 228.   Under these authorities a riparian owner has no right or interest whatever in the water.   His "control stops with the shore"; that is, the line of high-water.   The title to the very spot upon which the wharf stands, being in the state, the erection is wrongful, unless a grant from the state be shown: Gould on Waters, § 27.

The plaintiffs also claim under the provisions of an ordinance of the city of Portland.   The authority for this was the act of October seventeenth, eighteen hundred and sixty-two, compiled in Vol. 2, Hill's Code, as §§ 4227, 4228, and an ordinance of the city defining the wharf limits, and prescribing regulations for the construction of wharves.   But the plaintiffs can claim nothing under this act.   It was enacted long after the wharf was built. This statute operates prospectively, and can have no retroactive force.   The legislature might have given it a retroactive effect, so as to legalize wharfs already constructed, but it did not.   This statute was held in *Bowlby* v. *Shively*, 22 Or. 410, to be simply permissive, and not to vest any right until exercised; and further that was simply a license revocable at the pleasure of the legislature until acted upon.

But even if the legislature granted to plaintiffs every right that the state had, still a subsequent legislature could repeal the grant, for no right can be acquired by private parties which can prevent the state from changing the use to which the soil under water shall, in the public interest, be devoted, so long as such change is made to subserve either navigation, commerce, or fishery: *Illinois R. R. Co.* v. *Illinois*, 146 U. S. 387.   The license, if one exists, is revocable:   *Rundle* v. *Delaware & R. Canal Co.* 55 U. S. 14 How. 80, 14 L. Ed. 335; *Shrunk* v. *Schuylkill Nav. Co.* 14 Serg. & R. 71; *Monongahela Nav. Co.* v. *Coons*, 6 Watts & S. 101; *Susquehanna Canal Co.* v. *Wright,*

9 Watts & S. 9, 42 Am. Dec. 312.    By the Meussdorffer act
the legislature has impliedly granted this public street
for the purpose of a bridge since the committee have se-
lected it for that purpose.    The right to build bridges
across navigable streams wholly in one state, under the
authority granted by the state, can be questioned only by
the United States.    And it is clear that such bridges are
regarded as great aids to commerce:    *Gilman* v. *Phila-
delphia*, 70 U. S. 3 Wall. 713, 18 L. Ed. 96; *Escanaba Trans.
Co.* v. *Chicago*, 107 U. S. 678, 27 L. Ed. 442; *Willamette
Iron Bridge Co.* v. *Hatch*, 125 U. S. 1, 31 L. Ed. 629.

*Mr. George H. Williams* ( *Messrs. Charles E. S. Wood,
Stewart B. Linthicum,* and *J. Couch Flanders* on the brief),
for Respondents.

*Evidence of Dedication.*— There was a plat of an addi-
tion to Portland made by Capt. John H. Couch in April,
eighteen hundred and fifty, and it does not appear that
there was any other plat of this addition in existence
until eighteen hundred and sixty-five.    There is no evi-
dence in this case that on the plat of eighteen hundred
and fifty the *locus in quo* was dedicated as a public street;
but if there was any such dedication, then the persons
who subsequently acquired the title from the United
States or their grantees had a right to revoke such dedi-
cation and claim and use the property as private prop-
erty:    *Lownsdale* v. *Parrish*, 62 U. S. (21 How.) 290, 16
L. Ed. 80.

The McCormick map is not entitled to any considera-
tion.    It does not purport to be a map of Couch's Addi-
tion to the city of Portland, and there is no evidence
that Captain Couch or his wife ever recognized this map,
or, indeed, that they ever saw it.    If they knew of its
existence, they had no power to do anything with it.
There is no evidence that Captain Couch or his wife,

prior to eighteen hundred and fifty-nine (the date of the McCormick map), ever made any map in which B and C Streets were made to run to the river.  *Leland* v. *Portland*, 2 Or. 46, settled that.

As to the map of eighteen hundred and sixty-nine, we submit that this map does not purport to be—nor could it be understood by the public to be—anything more than a map of an extension of Couch's Addition to the city of Portland.  This view is confirmed by the form of the acknowledgment to this map, which reads, in its material part, as follows:   *   *   *   "and acknowledged that he recognized the foregoing as a correct description of the lots and blocks laid out by him."  This, of course, means the lots and blocks laid out by him on said map, which are designated and marked by a coloring of yellow.  All the other property, excepting a tier of blocks adjoining the yellow blocks laid out in eighteen hundred and sixty-seven, is left blank.  The only object which Captain Couch could have had in leaving the blocks and lots contained in the maps of eighteen hundred and sixty-five and eighteen hundred and sixty-seven blank in the map of eighteen hundred and sixty-nine, was to show that this map was not intended to effect those maps, but that the numbering of the lots and blocks and the dedication of the streets, outside of the extension by the map of eighteen hundred and sixty-nine, were to remain as by said former maps.

The references or recitals in these deeds do not estop Mrs. Couch or her heirs from claiming the property in question.  While recitals in a deed may be used as evidence, they are not conclusive upon the parties to the deeds, except where the deed itself is the foundation of the action or the defense.  Mrs. Couch and her heirs have a perfect right to show, notwithstanding what is said in these deeds, that no reference was made to the map of

XXV. OR.—10.

eighteen hundred and sixty-nine.  If this were an action
by some lotholder, whose lot abutted upon some street
which had been recognized as a street by the plaintiffs or
Mrs. Couch, then a question would arise which does not
arise in this case.  Here, the public authorities are claim-
ing this property, and the only ground, so far as the
writings in the case are concerned, upon which they
make their claim, is that in certain deeds there were
certain recitals which, as they claim, show that Mrs.
Couch knew that the land was dedicated for a street:
*Bingham* v. *Walla Walla*, 3 Wash. Ter. 68; *Bank of America*
v. *Banks*, 101 U. S. 240.

The use of the *locus in quo* by the public in the man-
ner in which it was used is entirely consistent with the
claim of ownership by the· plaintiffs:   *Kirk* v. *Smith*, 22
U. S. (9 Wheat.) 288, 6 L. Ed. 92.

Dedication is absolutely a question of intention.  The
evidence must be clear, and show a positive and unmis-
takable intention to abandon the property to the public:
*Hogue* v. *Albina*, 10 L. R. A. 673, 20 Or. 182; *Holdane* v.
*Cold Spring Trustees*, 21 N. Y. 474; *Smith* v. *Portland*, 30
Fed. Rep. 734; *Dovaston* v. *Payne*, 2 Smith's Lead. Cas.
Hare & W.'s notes, p. 155; Buswell, Limitations, § 251;
Angell, Limitations (6th Ed.), § 398; *Langworthy* v. *Myers*,
4 Iowa, 42; *Ellicott* v. *Pearl*, 35 U. S. (10 Pet.) 441, 9 L.
Ed. 487; *Ewing* v. *Burnet*, 36 U. S. (11 Pet.) 50, 9 L. Ed.
628; *Connecticut Mut. L. Ins. Co.* v. *St. Louis*, 98 Mo. 422;
*Wheeler* v. *Stone*, 55 Mass. 313; *Irwin* v. *Dixion*, 50 U. S.
(9 How.) 11, 13 L. Ed. 25.

*Wharf Rights of Plaintiffs.*— If the land upon which
the plaintiffs' wharf stands between high and low-water
mark is tide land, then it is expressly granted and con-
firmed to the plaintiffs by section 1 of the act of October
twenty-first, eighteen hundred and seventy-six, (Laws,
1876, p. 70,) and becomes absolutely their property.

This act declares that the Willamette River shall not be deemed a river in which the tide ebbs and flows within the meaning of the act, and the supreme court of this state, in the case of *Andrus* v. *Knott,* 12 Or. 501, decides that the shores of the Willamette River at Portland are not tide lands, and that the law as to the land between high-water mark and low-water mark, where the tide ebbs and flows, is not applicable to the Willamette River at Portland.

Assuming, then, that under the acts of our legislature and the decisions of the supreme court, the Willamette River at Portland is a river in which the tide does not ebb and flow within the ordinary meaning of those terms, we refer to the following cases, holding that the riparian proprietor has a right to build a wharf extending into the river for his own use or for the use of the public, and as far as the necessities of navigation may require:   *Yates* v. *Milwaukee,* 77 U. S. (10 Wall.) 497, 19 L. Ed. 984; *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, 36 L. Ed. 1018; *Parker* v. *West Coast Packing Co.* 5 L. R. A. 61, 17 Or. 515; Gould, Waters, § 179.

Touching the effect of the act of eighteen hundred and sixty-two, (sections 4227, 4228 of the Code,) we refer to the case of *Parker* v. *Rogers,* 8 Or. 187, and *Bowlby* v. *Shively,* 22 Or. 421.

As to the second section of the act of eighteen hundred and sixty-two, (Code, § 4228,) upon which the defendants' counsel seem to rely, we refer to an ordinance of the city of Portland of eighteen hundred and sixty-nine, establishing a wharf line in the Willamette River in front of the city of Portland. So far as the property in question is concerned, the ordinance as to the wharf line reads as follows:   "The wharf line of the river front of the city of Portland, is hereby established at and made to conform to the deep water line in this section

designated, to wit:   *   *   *   thence to a point in the center of C Street, and one hundred and ninety-two (192) feet from North Front Street; thence to a point two hundred and forty (240) feet east of Front Street, at the south line of A Street." This would make the wharf line in front of the property in question more than two hundred feet from North Front Street; and therefore this wharf is within the wharf line, as fixed by said ordinance, as the land in dispute and the wharf together, east of Front Street, are two hundred feet wide. Section 2 of said ordinance recognizes the existence of such wharves as had been constructed prior to its enactment by providing that if any such wharves extended beyond the line fixed by the ordinance, they should be changed so as to conform to the requirements thereof; which is an implied recognition of all wharves that were then in existence within the wharf line.

It was suggested that the act of eighteen hundred and sixty-two was only a license and revocable. We think it grants something more than an ordinary license; but if it be simply a license, then it has been executed, and a court of equity will not allow a licensor to revoke an executed license without compensation to the licensee. Washburn on Easements (3d Ed.), p. 680.

We deny, however, that if the act of eighteen hundred and sixty-two was a license, it has been revoked by the act of eighteen hundred and ninety-two, organizing the bridge commission. If the license to Allen & Lewis to keep a wharf in Portland has been revoked, then the licenses to all wharf owners in the city of Portland have been revoked; and, according to the doctrine of the defendants, the public authorities can take and destroy all the wharves in Portland, involving hundreds of thousands of dollars' worth of property, without compensation to the owners.

Assuming, for the sake of argument, that the land in question has been dedicated for a street, we insist that the defendants have no right to appropriate and obstruct it with the approach to a bridge. It must be admitted that the land in question belongs to the plaintiffs, subject to ·he pu lic easement, if the land was dedicated, as claimed by defendants; and, therefore, it cannot be subjected to a new servitude, and one not contemplated by the dedication, without the consent of plaintiffs: *Church* v. *Portland,* 6 L. R. A. 259, 18 Or. 73; *Warren* v. *Lyons City,* 22 Iowa, 351; *Morrison* v. *Hinckson,* 87 Ill. 587, 29 Am. Rep. 77; *Price* v. *Thompson,* 48 Mo. 361.

Opinion by MR. CHIEF JUSTICE LORD.

1.   Before proceeding to a discussion of the questions involved, it may be said that this strip is in Caroline Couch's half of the donation claim, and though there is some evidence that there was a plat made of an addition to the city of Portland by John H. Couch in April, eighteen hundred and fifty, there is nothing to show that the *locus in quo* was dedicated as a public street therein; and even if there was such plat having been made before the donation law was passed, it would not have the effect of constituting a dedication. Any person who should subsequently acquire the title from the government or its grantees, had a right to revoke such dedication, and subject the property to his private use. Nor is there evidence that Couch or his wife, prior to eighteen hundred and fifty-nine,— the date of the McCormick map,— ever made any map on which the *locus in quo* was platted as a street.

2.   To establish the proposition that the land in question has been dedicated as a public street, defendants introduced in evidence two plats and maps of Couch's Addition to the city of Portland. The first one is a litho-

graphic map of Portland, dated eighteen hundred and fifty-nine, made by S. J. McCormick. It shows that Burnside Street extends to the river, and thus includes the strip of land in dispute. The second map was made by John H. Couch on the twenty-second day of June, eighteen hundred and sixty-nine (exhibit D), and purports to be an addition to Couch's Addition which latter had already been laid out. It also shows that Burnside Street extends to the river. On the other hand, plaintiffs have introduced two maps of Couch's Addition to the city of Portland, one made by John H. Couch in eighteen hundred and sixty-five (exhibit A), and the other made by Caroline, his widow, Caroline E. Wilson, Clementine F. Lewis, Elizabeth R. Glisan, Mary H. Couch, his heirs, and George Flanders and Maria L. Flanders, on the fifteenth day of November, eighteen hundred and seventy-two (exhibit C). Both these maps show that Burnside Street terminates at the west side of Front Street, and that the strip of land in controversy is private property. It thus appears, so far as the maps and plats are concerned, that the two introduced by the defendants show that Burnside Street extends to the river, while the two introduced by the plaintiffs show that it terminates at the west side of Front Street. As to the lithographic map of eighteen hundred and fifty-nine, there is no evidence to show, nor is it claimed, that John H. Couch or his wife signed or acknowledged or had anything to do with making it. The point upon which the defendants mainly rely in respect to such map as showing a dedication is that it was in general use in the city, and the only public map referring to Couch's Addition from eighteen hundred and fifty-nine to eighteen hundred and sixty-five, during which time John H. Couch and his wife made certain deeds in which the lots were described by reference to "Couch's Addition to the city of Portland."

It is argued that the reference in these deeds to Couch's Addition, under the circumstances, was intended to refer to such addition as platted on said map and was therefore a recognition of it, and in legal effect, a dedication of the streets as platted thereon. We are unable to assent to this inference. The admitted facts show that the strip of land in dispute belonged to Caroline Couch as donee of the United States, and that it was conveyed to the plaintiffs Allen & Lewis and Flanders, together with certain lots, some time in eighteen hundred and fifty-four, and that they are now the owners and entitled to the possession of it, unless the public has acquired an easement therein as a street. It is probable that after they acquired the title from the United States, Couch and his wife may have continued to use a prior map, exhibiting it to intending purchasers, and selling their lots with reference to it, but there is nothing to show that Couch or his wife ever recognized the McCormick map, or that they ever saw it, or knew of its existence. In fact, it does not purport to be a map of Couch's Addition to the city of Portland. In view of these considerations we do not think that the reference in their deeds to "Couch's Addition" was intended to refer to their property as platted on the McCormick map.

3. It is not this, however, but the map of eighteen hundred and sixty-nine upon which the defendants mainly rely as establishing a dedication of the *locus in quo* as a public street. It is claimed, that all the plaintiffs, except Mr. Allen, made deeds conveying lots with reference to this map. All that can be said in support of this claim is that these parties made certain deeds, referring therein for description to the "map of Couch's Addition to the city of Portland." But inasmuch as Couch had made a map in eighteen hundred and sixty-five, upon which the *locus in quo* was not platted as a

part of Burnside Street, even if we assume that the map
made by him in eighteen hundred and sixty-nine platted
it as a part of such street, there is nothing to show
whether the general reference in these deeds was to the
map of eighteen hundred and sixty-five or eighteen hun-
dred and sixty-nine. Mrs. Couch, during the time that
she was the owner of the land in dispute, never made any
maps or plats dedicating it as a public street, nor had any
of the plaintiffs. The maps and plats made by John H.
Couch, after he and his wife had conveyed this land, as
already stated, to the plaintiffs Allen & Lewis and Cap-
tain Flanders, would not bind them, unless they accepted
and acted upon such maps, and there is no evidence that
they accepted and acted upon the map of eighteen hun-
dred and sixty-nine, other than the mere fact that they
made certain deeds in which they described the property
by reference to the "map of Couch's Addition to the city
of Portland," which reference was as likely to be to the
map of eighteen hundred and sixty-five, or to some prior
map of which there was some evidence, as to that of
eighteen hundred and sixty-nine.

It is sought, however, to obviate this objection by
showing that some of the deeds conveyed lots and blocks
that were for the first time platted on the map of eighteen
hundred and sixty-nine, or, in other words, that such
deeds conveyed lots and blocks that appear on no
other map, and hence it is argued that the reference to
them was necessarily to the map of eighteen hundred
and sixty-nine, which, it is claimed, shows that the prop-
erty in dispute was a part of Burnside Street. It is true
that such lots and blocks did not appear on any other
map, for the reason that the map of eighteen hundred
and sixty-nine was intended as an addition or extension
of prior maps, but this affords no justification for the as-
sumption or argument that such map, made by John H.

Couch, shows a dedication of the *locus in quo* as a public street.  Before, however, it can be assumed that his wife recognized the map of eighteen hundred and sixty-nine, by joining with her husband in such deeds, as showing a dedication of her property, so as to bind or estop her, such map itself ought to show the dedication so distinctly and positively as to make the evidence of her intention to divest herself of the title entirely clear.  The map itself does not purport to be anything more than a map of the extension of Couch's Addition to the city of Portland.  The lots and blocks laid out 'on it, which constitute the new addition, are designated and marked by a coloring of yellow, and all the other property, except a tier of blocks adjoining such yellow portion, is left blank.  This indicates that the map of eighteen hundred and sixty-nine was not intended to affect the prior maps. Its object was to plat a second addition, and to show its position relative to the first one.  The numbering of the lots and blocks and the dedication of the streets outside of the extension were to remain as platted on the prior maps.  This must be so, as it is impossible to convey any lots or blocks by reference to such map, outside of the extension, because they are left in blank, and hence deeds referring to lots and blocks as numbered by map of eighteen hundred and sixty-nine necessarily referred to it, and did not appear on any other map, because such lots and blocks composed the new addition or extension of prior plats, but as we have shown, the other portion of such map negatives the idea that it was intended to change the map of eighteen hundred and sixty-five, or prior maps, or that it undertook to represent the *locus in quo* as a part of Burnside Street.  This view is confirmed by the form of acknowledgment to this map, which reads, in its material parts, as follows:  "That he recognized the accompanying diagram or plat as a true and correct

description of lots and blocks laid out by him as an addition to the city of Portland." This, of course, means the lots and blocks laid out on this map as a new addition, indicating that the added blocks copied from prior maps were only intended to show their relative position to such new addition, and not to alter or affect the prior maps. We do not think, therefore, that any representations as to Burnside Street upon that portion of the map left in blank,—such portion constituting no part of the addition,—can be construed as intending to make a dedication of the *locus in quo* to affect the prior maps.

The map of eighteen hundred and seventy-two is the only one that Caroline Couch or the plaintiffs ever signed, and it shows that the property in question is not a part of Burnside Street. This map corresponds with that of eighteen hundred and sixty-five, and, as we construe it, is not in conflict with the map of eighteen hundred and sixty-nine. We do not think, therefore, that such deeds as were made of lots and blocks which appear only in the map of eighteen hundred and sixty-nine, was a dedication of the *locus in quo*, or that they can be reasonably construed to be a recognition of any dedication thereof. In thus holding we do not controvert the principle that where a proprietor recognizes a plat in making a sale of lots he will be estopped to deny a dedication of the streets designated upon the plat embracing his property, but we do not think, in view of the facts, that such principle can be applied to the case at bar.

4. The second defense is dedication by user. It is claimed by the defendants that the *locus in quo* has been used by the public, with the consent of the plaintiffs, the same as other streets similarly situated have been used, for more than twenty years, and that therefore the public has a prescriptive right to the same. A dedication of land to the public use rests on the intention or assent of

the owner.  As it is purely a question of intention, the
evidence of it, when resting in parol, must be clear and
satisfactory, and indicate a positive and unmistakable in-
tention to devote the property to public use.  All the
authorities agree that the acts and conduct of the owner,
when relied upon to show the dedication of his property,
must be deliberate and unequivocal, manifesting a clear
intention to abandon such property to the public use.
The burden of showing it rests on the defendant.  The
security of titles requires that the evidence of dedication,
when depending on parol proof, should be of such a de-
liberate and decisive character as to leave no doubt of the
owners' intention.  Hence, the rule is well settled by
numerous authorities that before there can be a valid
dedication there must have been an actual intention,
clearly indicated, by deliberate and unequivocal words or
acts, to dedicate the property to the public:  *Hogue* v.
*Albina*, 20 Or. 185, 10 L. R. A. 673, 25 Pac. 386.

5.  It appears from the testimony that some time in
eighteen hundred and fifty-four, and soon after the plain-
tiffs Captain Flanders and Allen & Lewis bought the
property, they built a wharf in front thereof for ocean
vessels and river craft; that it was one of the first
wharves built in the city, and for many years was the
principal landing for such vessels; that it has been
maintained there continuously ever since, although it
has been rebuilt several times, and extensions added.
The wharf extends across the *locus in quo*, and out from
the bank of the river about one hundred feet to the navi-
gable water of such river, and is seven hundred feet in
length.  A roadway or street was left open from the east
side of Front Street to the wharf, for the purpose of ingress
and egress.  The wharf opposite the street is two-story,
and at the time it was built the plaintiffs last mentioned
constructed an elevated passage way twenty feet wide on

the north side of this roadway, from Front Street to the upper story, and enclosed the space underneath, and used it for a stable and storehouse. This roadway or street has been used by the public and plaintiffs as a means of conducting and carrying on the business appertaining to this wharf and warehouse, and the facts indicate that it has not been used for any other purpose. The plaintiffs have at all times maintained their right to the *locus in quo*, consistent with its use as a passage or roadway to and from their wharf, and the use of it by the public for such purpose was not under a claim of right, but by their permission. The city authorities have not exercised any acts of ownership over or assumed any right to control it; nor has the city made any improvements or performed any work upon the same by way of repairs or otherwise, but the evidence shows that the plaintiffs have used and occupied such property to the exclusion of the public, except so far as was necessary for the public to use it in doing business at their wharf. The evidence also shows that the plaintiffs have asserted their ownership of the land in controversy by acts and declarations which are entirely inconsistent with any intention to abandon or dedicate it to the public use. They have used it for the storage of iron, brick, and other heavy freight; they have improved and repaired it; they have kept a gate across it for ten or twelve years; exercised the right to exclude persons or teams from it whenever they chose to do so; they have publicly and repeatedly, in connection with the use of the property, declared that it was not a public street, but a private way to their wharf and warehouse.

In *Irwin* v. *Dixon et al.* 50 U. S. 9, in which the facts are similar to the case at bar, the court says: "From the very nature of wharf property, likewise, the access must be kept open for convenience of the owner and his

customers, but no one ever supposed that the property thereby became public instead of private. * * * No length of time, during which property is so used, can deprive an owner of his title. * * * While any one might be allowed to travel over this space from the warehouse to the wharf and river, when convenient and not interferring with the owner, it would not be because it had been intended to give to the public a right of way over these premises, but because he himself intended to travel over it, and while so doing and so leaving it open, would not be captious in preventing others from traveling there." The same principle is laid down in the note to *Dovaston* v. *Payne*, 2 Smith's Leading Cases, Hare & Wallace's notes, 155, wherein it is said: "If, therefore, a person opens and uses a space upon his own land as a road for his own convenience and purposes, the mere fact that the community are allowed to make use of it in common with him for even twenty or thirty years will not constitute a dedication of it to the public use, especially in the face of declarations on his part inconsistent with an assent to such dedication." So that the use of the *locus in quo* by the public in the manner referred to is entirely inconsistent with the ownership of the plaintiffs, and therefore the public have not acquired a prescriptive right by user to the land in controversy.

6. The next question to be determined is as to the right of the plaintiffs to erect and maintain a wharf at the *locus in quo* extending to the navigable water of the Willamette River. The contention for the defendant is that the title to the soil under the Willamette River is in the state by virtue of its sovereignty, and that riparian owners, without a license or grant from the state, have no authority or right to maintain a wharf beyond the ordinary high-water mark. Hence, they claim that, if the plaintiffs have erected their wharf and extended it

over the submerged soil of such river to its navigable waters without any license from the state, they have erected a purpresture, which may be abated, or removed, as a common nuisance. The theory of their argument is that in this country the law as to navigable fresh-waters is the same as to waters moved by the tide; that, in either case, the state, by virtue of its sovereignty, is the owner of the subjacent soil of its navigable rivers, including tide lands or submerged lands contiguous to deep water; that as such owner, it has the right to regulate the use of such lands, or to dispose of them in any way that will not impair or injuriously affect the public interests in such rivers, especially for purposes of navigation and commerce, free from any easement of the upland owners, who can only acquire the right to extend a wharf over them by its consent, obtained by legislation, or acquired by acquiescence through local usage; and that, as a consequence, unless the plaintiffs, as riparian owners, have obtained the consent of the state to extend their wharf over the submerged soil of the Willamette River to the point of its navigability, they cannot be considered as having any right in the premises which the state is bound to respect; nor can their wharf be recognized as a legal structure, the taking or condemnation of which for a public use would entitle them to compensation as for private property.

By the common law, in England, the title to the shore of the sea, and the arms of the sea, and the soil under tide water, is vested in the king, who has a proprietary interest therein which he may grant or dispose of, subject to the public use for navigation and commerce. "The *jus privatum*," says Lord HALL, "that is acquired by the subject, either by patent or prescription, must not prejudice the *jus publicum*, wherewith public rivers and the arms of the sea are affected to the public use": De

Jure Maris, 22.   The soil so vested in the king can only be transferred subject to the public trust.   In this country the state has succeeded to the ownership and sovereignty over such lands, charged with a like public trust; and the law is now regarded as settled that the state, by virtue of its sovereignty, is regarded as the owner of lands covered by tide water, and, as an incident of such ownership, has the right to use or dispose of them in such way as will not impair or prejudice the public interests or privileges, such as fishing, navigation, and commerce. As touching this subject, Mr. Justice FIELD said:  "Upon the admission of California into the union upon equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations, or among the several states, the regulation of which was vested in the general government":   *Weber* v. *State Harbor Commissioners*, 85 U. S. 18 Wall. 65.   And in *Bowlby* v. *Shively*, 22 Or. 410, 30 Pac. 154, in conformity with our previous adjudications, it was held that when the state of Oregon was admitted into the union the tide lands became its property, and subject to its jurisdiction and disposal; that, in the absence of legislation or usage, the common-law rule would govern the rights of upland proprietors, and by that law the title to such lands is in the state; that the state has the right to use or dispose of its title in such manner as it might deem best, free from any easement of such upland owners therein other than such as the state might choose to resign to them, subject only to the paramount right of navigation, and the uses

of commerce. The same rule has been extended to our great fresh-water lakes, which, owing to the extended commerce conducted upon them, are treated as inland seas; and also, in some of the states, to the great fresh-water rivers which are navigable in fact, as the Mississippi, the Missouri, the Ohio, and, in the state of Pennsylvania to all its permanent rivers; such rule depending on the law of each state as to what waters, and to what extent, the prerogative of the state over the lands under water shall be exercised. The question, as Mr. Justice Bradley said, is one for the several states themselves to determine. "If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections": *Barney* v. *Keokuk*, 94 U. S. 324. So it appears that the same rule as to the ownership of and the sovereignty over lands under the navigable waters of the great lakes and fresh-water rivers applies which obtains at common law as to the ownership of and sovereignty over lands under tide waters, and that such lands are held by the same right in the one case as the other, and subject to the same trusts and limitations: *Illinois Cent. R. R. Co.* v. *Illinois*, 146 U. S. 436, 13 Sup. Ct. 110.

7. In respect to the tide lands, the state, as owner, has provided by legislation for their sale and disposal free from any right of the upland owners therein, except such as it saw fit to recognize in them, or their grantees, in consideration of the fact that prior to such legislation, the tide lands had often been dealt with by the adjacent owners as private property, subject however to the paramount right of navigation and the uses of commerce: *Bowlby* v. *Shively*, 22 Or. 410, 30 Pac. 154. But in respect to navigable fresh-water rivers in this state, there has been no legislation for the sale or disposal of any portion of the submerged lands lying between the upland and

navigable waters. Such lands, so far as any legislative action is concerned, have not been treated by the state in the proprietary way which it has asserted and applied to the tide lands; and some of the decisions of its courts recognize certain rights in the riparian owners, arising from adjacency, which do not belong to them in common with the public. In *Minto* v. *Delaney*, 7 Or. 337, it was held that the river is the boundary of lands lying along the Willamette, and that accretions formed on the shore by the gradual receding of the water belong to the riparian owner, and in *Moore* v. *Willamette Transportation Co.* 7 Or. 357, that rocks and shoals along the margin of the same river belong to the riparian owner. While, therefore, the state, as the owner of the submerged lands of navigable fresh-water rivers, has not treated its proprietary interest in any portion of them as subject to sale or disposal, it has recognized certain rights in the riparian owners, not common to the public, in the shoal water in front of their lands.

It is common knowledge that before and after the state was admitted into the union, the riparian owners along the navigable fresh-water streams within its limits acted on the assumption that the right of wharfage was incident to their land, and built wharves in front thereof. Some of these wharves, like the plaintiffs', are expensive structures, and of great advantage and benefit to commerce. Nor is this all. Upon the tidal waters, such owners, believing that the tide lands adjacent to their uplands belonged to them, built wharves over the same, and dealt with them as private property. This condition of things was recognized in the legislation referred to, (Laws, 1876, p. 70,) and in consideration thereof, and as an act of justice, a preference was given to the riparian owners in the provisions for the sale of such land, "though the state was under no legal obligation to recognize the

XXV. OR.— 11.

rights of either the riparian owner or those who had occupied these tide lands," as BOISE, J., said, "still the legislature, considering the fact that these lands had been dealt with as private property, and improved sometimes by the erection of expensive structures which were a great advantage to commerce, made what we think wise and just provisions for the protection of those who had spent their money in purchasing and improving these lands, which improvements were in many cases absolutely necessary as aids to commerce": *Parker* v. *Rogers*, 8 Or. 190. All this goes to show that the custom which obtained of building wharves along the navigable rivers of the state by riparian owners was fully understood, and that there was no intention to interfere or obstruct the right to wharf across the submerged lands on non-tidal or fresh-water rivers, but that the act was only designed to provide for the sale of tide lands on tidal waters, the effect of which was inconsistent with any easement or right of the upland owner therein not granted to him in such act. This becomes all the more apparent by the proviso in the tide land act (Laws, 1876, p. 70,) which provides: "That the Willamette, Coquille, and Coos Rivers shall not be deemed rivers in which the tide ebbs and flows, within the meaning of this act,  *  *  *  and that the title of this state to any tide or overflowed lands upon said rivers is hereby granted and confirmed to such owner of the adjacent lands." This grant conveyed the title to all such lands along these rivers, whether tide or overflowed, to the riparian owners, subject to the public trust. As the Willamette is a fresh-water river, and only slightly affected by the tides a short distance from its mouth, there is no tide land at Portland, as held in *Andrus* v. *Knott*, 12 Or. 501, 7 Pac. 763, and therefore it results that if the submerged or overflowed lands described in the act include such as are not affected by the tides, and lie be-

tween the upland and navigable water, they belong to such owners, subject to the paramount right of navigation and commerce.  There is a marked distinction made by such legislation between the submerged lands of fresh navigable waters and those covered by the flux and reflux of the tide, and known as tide lands.  In view of these considerations, and the tendency of our adjudications to recognize rights in the riparian owners on the Willamette River that do not belong to the public, and the custom which has prevailed from the early settlement of the country in respect to the building of wharves, it is at least reasonable to infer that the state has acquiesced in the right of the riparian owners to build wharves in aid of navigation.  In fact, the absence of legislation in respect to the state's proprietary interest in the shoal water of submerged lands of the Willamette River, taken in connection with the legislation providing for the sale and disposal of tide lands, and adjudications to the effect that the grant of its proprietary interest therein is free from any easement of the riparian owner, and subject only to the public right of navigation and commerce, leads to the conclusion that it is the policy of this state, as of other states, to allow riparian owners on such rivers to build wharves in aid of navigation.

Mr. Gould says:  "Riparian owners upon navigable fresh-water rivers and lakes may construct in shoal water in front of their land, wharves, piers, landings, and booms in aid of and not obstructing navigation.  This is a riparian right, being dependent upon title to the bank, and not upon title to the river bed.  Its exercise may be regulated or prohibited by the state; but so long as it is not prohibited, it is a private right derived from the passive or implied license by the public.  As it does not depend upon title to the soil under water, it is equally valid in the states in which the river beds are held to be public

property and in those in which they are held to belong to the riparian proprietors, *usque ad filum aquæ*." Again, he says: "The legislature may authorize the extension of such structures beyond low-water mark; but if not sanctioned by the legislature, they are illegal, so far as to interfere with or limit the right of navigation": Gould on Waters, § 176. In view of these considerations, the wharf of plaintiffs, being in aid of navigation, is a legal structure and private property, which can only be taken for public use according to established law, and with due compensation therefor.

8. Passing these considerations for the present, there is another phase of the case which seems to be decisive of the assent of the state to the building of plaintiffs' wharf. The legislative assembly, at its session held in eighteen hundred and sixty-two, passed the following act relating to wharves in cities: "Section 4227. The owners of any land in this state lying upon any navigable stream or other like water, and within the corporate limits of any incorporate town therein, are hereby authorized to construct a wharf or wharves upon the same, and extend such wharf or wharves into such stream or other like water beyond low-water mark so far as may be necessary and convenient for the use and accommodation of any ships or other boats or vessels that may or can navigate such stream or other like water.—Section 4228. The corporate authorities of the town wherein such wharf or wharves is proposed to be constructed shall have power to regulate the exercise of the privilege or franchise herein granted; and upon the application of the person entitled to and desiring to construct such wharf or wharves such corporate authority shall, by ordinance or other like mode, prescribe the mode and extent to which the same may be exercised beyond the line of low-water mark, so that such wharf or wharves shall not be con-

structed any further into such stream or other water beyond such low-water line than may be necessary and convenient for the purpose expressed in section 4227, and so that the same will not unnecessarily interfere with the navigation of such stream or other like water." In eighteen hundred and sixty-nine, the city of Portland, under the authority of this statute, passed an ordinance defining the wharf limits and regulating the building of the same. Section 3 of this ordinance provides that "all wharves and piles now erected or driven beyond the lines described in section 1 of this ordinance shall be removed to conform to the above described line within ten years from the date of the approval of this ordinance; *provided*, that if any such wharf or structure shall be at any time destroyed by the elements, or so damaged as to necessitate the rebuilding thereof, it shall be rebuilt to conform to said above described lines."

The contention for the defendants is that the plaintiffs' wharf having been already built when the statute was passed did not come within its purview; that the statute provides for the doing of future acts under the regulation of the corporate authorities; that it does not legalize or attempt to legalize wharves theretofore constructed; that the words "proposed to be constructed," and "desiring to construct," and "hereby authorized to construct," show beyond cavil that future and not past erections were what the lawmakers had in mind. The rule undoubtedly is that a statute is to be construed to operate prospectively and not retrospectively, unless the language is so plain and direct as to preclude all question as to the intention of the legislature. The rule is founded on the principle that a construction should not be given to a statute that will take away, or restrict rights, unless the intention of the legislature cannot be otherwise satisfied. A retrospective law is always subject to the limitation that it

shall not be such as is termed _ex post facto_, or as impair the obligations of contracts. But we do not think there is any occasion to apply the principle suggested to the statute in question. There is no claim that it affects past transactions, or relates back and gives them validity. It is not pretended that the statute has a retroactive effect, and made wharves legal structures which were erected prior to its enactment. The statute neither commands certain acts or things to be done, nor prohibits them from being done. It is a permissive statute, which allows certain things to be done without commanding them. "Under the provision of the statute," said Boise, J., "any person within an incorporated town within this state may build and maintain a wharf from his land at high-water into navigable water, so far as is necessary or convenient to accommodate shipping, if he conforms to the legal restrictions imposed on him by the authorities of the town, and does not impede navigation. Such structures are erected in all commercial towns, and have been recognized as legal structures in all the states": _Parker_ v. _Taylor_, 7 Or. 446. The statute simply grants permission or license to any upland owner in an incorporated town whose land fronts upon a navigable stream to construct a wharf in front of his land, which permission, when acted upon, renders his wharf a legal structure. Its object is to encourage the building of wharves to aid navigation, and for the benefit of commerce. Within its purport, then, what difference would it make whether the wharf was built before or after the statute was enacted. In either case, the wharf would serve the object it sought to accomplish, and hence be a legal structure within its spirit and intent.

9. But it is argued that the leave granted under the statute, being merely a permission or license, it is revocable at the pleasure of the state; and that, as a conse-

quence, the wharf of the plaintiffs' ceases to be a legal structure, or to have a legal existence, when the leave is withdrawn, or the license revoked.   The statute has not been repealed either directly or by implication, and so far as it is concerned, there is no revocation of the license granted.   The most that has been claimed for the Meussdorffer Act (Laws, 1891,) in that connection is that it,—being for a public purpose,—operates to revoke the license of the plaintiffs, and thereby to deprive their wharf of its legal foundation and existence.   It will be observed, then, that the argument is based on the theory that the permission granted by the statute to build wharves is merely a license, and, as such, may be revoked at the pleasure of the state, after it has been acted upon, and the wharf erected.   This is not so.   As was said in *Bowlby* v. *Shively*, 22 Or. 410, the statute does not vest any right until exercised; it is a license revocable at the pleasure of the legislature until acted upon and availed of.   It is doubtless true that if the statute should be repealed, or the adjacent tide lands disposed of, the privilege given the upland owner to build a wharf across the tide lands to deep water, unless acted upon, or availed of, would be revoked.   But the riparian owners who have taken advantage of the permission or privilege to build wharves—especially those on fresh navigable waters, for the reasons suggested—have acquired rights that would not be affected by the repeal of the statute.   These wharves are legal structures, and as such are private property, which cannot be taken without due process of law, and due compensation therefor.   Hence, the contention of the defendants that the Meussdorffer Act—which authorizes the location and construction of the Burnside-Street bridge, and under which they are proceeding to build it—is a revocation of the leave or license, cannot be maintained.

Nor do we find anything in the case of the *Illinois Central R. R. Co.* v. *State of Illinois,* 146 U. S. 436, in conflict with this result. There the grant of the submerged soil of the lake was in such quantity as, in the opinion of the court, impaired the public interest in its waters, and operated, if irrepealable, as an abdication by the state of its trust over the property. The right of a riparian owner to build a wharf over the submerged soil of a river to navigable water is not inconsistent with the public interest, nor in prejudice of the public rights. Nor does the grant of such subjacent soil or tide lands, subject to the paramount right of navigation and commerce, authorize its use for any purpose inconsistent with the public interest. The land in front of the riparian owner, when used for a wharf, and under proper regulation, is in aid of navigation, and for the benefit of commerce. Of course the state has the right to regulate the building of wharves, or to determine how far rights in submerged soil can be exercised consistently with the easement of navigation. Our state has made such regulations, and, as there is no claim that the wharf of the plaintiffs impedes navigation, or is not erected in conformity with its requirements, it must be regarded as a legal structure, and entitled to be protected as private property. Although the evidence shows that the original wharf was torn down and rebuilt in the year eighteen hundred and seventy-six in conformity with the ordinance, we have not deemed it necessary to refer to that fact as strengthening the right of the plaintiffs in the premises. Within the principle and for the reasons suggested, it is apparent that the cases of *Rundle* v. *Delaware & Raritan Canal Co.* 55 U. S. (14 Howard) 80; *Monongahela Nav. Co.* v. *Coons,* 6 Watts & S. 101; *Susquehanna Canal Co.* v. *Wright,* 9 Watts & S. 9, 42 Am. Dec. 312, do not determine the questions involved in the case at bar. The right to build

and maintain a wharf, being in aid of navigation and for the benefits of commerce, rests on a different footing and principle from a license to erect mills with dams which may impede or obstruct navigation, or canals diverting the waters of a navigable river.   Without further reference, it is sufficient to say that we think the plaintiffs have a right of property in their wharf of which they cannot be deprived except in accordance with established law, and if it should be necessary that it should be taken or destroyed for the use of the bridge, that it cannot be done without due compensation therefor:   *Monongahela Nav. Co.* v. *U. S.* 148 U. S. 312, 13 Sup. Ct. 622.

This decree must be affirmed.                AFFIRMED.