## BOARD OF COM'RS OF GARFIELD COUNTY v. ANDERSON.

No. 25240. Jan. 16, 1934.

Rehearing Denied Jan. 30, 1934.

Dave Bucher, County Attorney, and A. L. Zinser, Asst. County Attorney, for plaintiffs in error.

Dyer & Smith and H. O. Glasser, for defendant in error.

RILEY, C. J. This action was commenced by R. L. Anderson, herein referred to as plaintiff, against the board of county commissioners, the county clerk, and the county treasurer of Garfield county, herein referred to as defendants, for an injunction enjoining defendants from erecting a courthouse, and expending any funds of the county therefor, upon a strip of land running across the courthouse square in the city of Enid. The ground alleged and relied upon for relief was that said strip of land had

theretofore been dedicated by the board of county commissioners to the public and used for a street or public thoroughfare, and that to so erect such courthouse would completely and permanently close such street or highway over and across the courthouse square.

The land involved is a part of block ten (10) in the original townsite of Enid. The 1/4 section within which this block is located is a part of the one-half section reserved for townsite purposes from homestead entry by the proclamation of the President opening the Cherokee Strip to settlement in 1893. The land was platted for townsite purposes. The original plat was filed in the office of the register of deeds May 8, 1894. The block in which the land in controversy is located was designated in said plat as block 10, comprising five acres, and is in width (east and west) the same as the other blocks, but in length (north and south) it is practically that of two blocks and the intervening street. It is divided into two lots, 1 and 2. Lot No. 1 is the north four acres and is marked "Court House Reserve." Lot 2 is the south one acre and is designated on said plat as "Land Office Reserve." The entire block is 320 feet wide and 680 feet long. The United States postoffice is now located on lot 2. Blocks 9 and 13 are on the east and blocks 11 and 12 are on the west of block 10. There is a street running east and west, 110 feet wide, between blocks 9 and 13, and between blocks 11 and 12, but it is not shown on said plat as extending across block 10.

Patent was issued to Garfield county for lot 1, in block 10, in 1906. The lot is described therein as "Lot numbered One in Block Ten, designated, 'Court House Reserve' in the Townsite of Enid, Garfield County, Oklahoma, containing four acres according to the approved plat of said townsite." The patent is a grant by the United States of America "unto said County of Garfield and its Successors." The habendum clause reads: "To have and to hold * * * unto the said County of Garfield, and to its successors and assigns forever."

Before the patent was issued Garfield county had erected a courthouse on lot 1 north of the strip here in controversy. The strip was used as a street until about 1907, when a new courthouse was erected on lot 1 in the center of what is now claimed to be a street and upon the strip in controversy.

This courthouse stood until January 29, 1931, when it was destroyed by fire.

No action was taken to rebuild the court-

house until about August, 1933, when a resolution was adopted by the board of county commissioners calling an election in said county to vote upon a proposition to make a special levy or tax of two mills to raise sufficient funds, together with funds already on hand and a grant sought from the United States, to erect a new courthouse. The election was held on September 26, 1933, resulting in a heavy majority authorizing such special levy.

Thereafter on October 7, 1933, the board of county commissioners adopted a resolution locating the proposed new courthouse on a site substantially the same as that of the one which had been burned, which would be across the strip now claimed to be a street, the result of which would be to close it.

In the meantime there had been considerable agitation for the opening of a street across lot 1.

About February 21, 1931, there was filed with the county clerk petitions signed by some 600 residents of the city of Enid, requesting the opening of the street, known as Broadway, and also to locate and build a new courthouse on the north half of the "Square." No official action was ever taken on these petitions.

On June 4, 1931, the board of county commissioners entered into a contract with one G. W. Reddick for the demolition and removal, within 75 days, of the remains of the courthouse, including the basement floor, broken masonry, mortar and debris of every kind. Thereunder, all that remained of the burned courthouse, including basement floor, basement walls, etc., was removed from the courthouse square.

There had also been on said lot and within the area in controversy, a soldier's monument, a fish pond, a sunken garden, and certain trees and shrubbery. These were all removed. The county surveyor or engineer removed the curbing along the east and west sides of the lot, the full width of the street. The basement of the old courthouse and the sunken garden were filled up at the expense of the county. The county engineer and the city engineer surveyed or staked out a street across the lot to conform to Broadway street as extended across said lot. It was graded and made passable for vehicles. This grading was completed sometime about February, 1932. The strip was used extensively by the public from that time until this action was commenced in the superior court of Garfield county October 27, 1933.

The board of county commissioners, prior to July 1, 1933, was composed of Eli M. Wells, chairman; L. C. Gossett and E. E. Way, members. At the election held in November, 1932, a new board composed of J. L. Allen, D. G. Anderson, and Chester C. Smith, was elected. Their terms commenced July, 1933.

The question of the location of the new courthouse appears to have been one of considerable local interest. There were three proposed sites advocated by three separate factions, one on the north part of lot 1, one on the south part, and one at the site in controversy.

At the same election at which the question of the special levy was submitted to the voters of the county the question of the site of the proposed new courthouse was submitted; the three sites above mentioned were submitted to the voters.

On the question of the special levy 7,531 votes were cast. On the question of the site for the new courthouse 7,494 votes were cast. The site on the south part of the lot received 1,416 votes; that on the north part received 2,454 votes, and the one in the middle, the site of the old courthouse, the one here involved, received 3,624 votes, 124 less than a majority of all the votes cast. (It was conceded, however, by both parties at the trial that said election was at most advisory only, and binding on no one as to location of the site).

After the adoption of the resolution locating the proposed new courthouse upon the disputed area, plaintiff commenced this action in the superior court of Garfield county and sought a permanent injunction against the erection of the building on said site as aforesaid.

Plaintiff pleaded at length the various acts and conduct of the board of county commissioners, and alleged that the same constituted a complete valid common-law dedication of the disputed area as a public street, highway, or thoroughfare, and that by the use of same by the public as such thoroughfare for a period of some two years such dedication was accepted and became absolute and irrevocable before the attempt by the board of county commissioners, as now composed, to locate thereon the proposed new courthouse.

A temporary injunction was issued, and thereafter the city of Enid filed its plea of intervention, adopting the allegations of the plaintiff so far as applicable, and restated many of them, and in addition pleaded a great and pressing necessity for a public

street across said block, and further alleged the acts of the former members of the board of county commissioners as a common-law dedication of the disputed area for a street, highway, or thoroughfare. But it did not allege that the city ever accepted such dedication or took charge of and jurisdiction of the area as a part of the streets of said city, and particularly as a part of Broadway street over and across said lot 1.

Defendants answered at length, pleading the origin and nature of the title acquired by the county to said lot 1, and specifically denied that they or their predecessors in office ever dedicated the disputed area as a street or highway, or that it had ever been accepted as such by the city of Enid, or that it had ever been used by the city of Enid, or the public generally as a street or highway. They then alleged that defendants had at all times kept and maintained control of the entire lot 1, including the disputed area.

The regular judge of the superior court certified his disqualification and the parties agreed upon Honorable C. C. Roseman, a member of the bar of Garfield county, as special judge or judge pro tem to try said cause. The cause was tried to the court, resulting in findings, judgment and decree in favor of the plaintiff. The plea of intervention of the city of Enid was taken under advisement for further consideration, and thereafter the court indicated that the relief granted to plaintiff was sufficient to protect the city, whereupon the city of Enid asked and was granted leave to dismiss its plea without prejudice, and said plea of intervention was so dismissed.

The trial court found specifically that the acts of the county commissioners constituted a full and complete dedication of the disputed area as a public thoroughfare, and that it was accepted by the public and thereupon became an irrevocable easement and right of the public to use same as a part of Broadway street extending across the public square, so long as the public shall use the same. The court further found that said strip of land was not necessary for courthouse, jail, or other county purposes, and that such use of said strip does not interfere with the use of said courthouse reserve for the courthouse, jail, or other county purposes, and defendants, their servants, agents, and employees were perpetually enjoined from in any way or manner interfering with the public in the use of said strip as a thoroughfare, or building any courthouse or any other structure in said area, and defendants and their successors were forever enjoined from doing any act directly or indirectly interfering with the full use of said area by the public as a street or thoroughfare.

From this decree, defendants prosecute this appeal.

It is contended (first) that the board of county commissioners had no power or authority to dedicate any part of the courthouse reserve (lot 1, block 10) as a public street. Second: That the acts of the county commissioners, as shown by the evidence, did not constitute a dedication of the area in dispute as a public street, highway, or thoroughfare. Third: That plaintiff has not shown himself entitled to any relief, as he had suffered no detriment and would suffer no detriment and his property would not be affected in any way.

We will consider the propositions in their reverse order.

Plaintiff owns a lot facing the street running east and west on the north side of the courthouse square, and although his property would not be directly affected, he testified that his property would be lessened in value by an increased amount of traffic being thrown upon the street in front of it, and thereby the rental value of his property would be decreased.

It is quite generally held that any citizen, if likely to be injured in his individual rights with respect to his property by a misuse or diversion of dedicated property, may maintain an action to enforce or preserve the use. 18 C. J. 131.

Some cases hold that any inhabitant of a town or city may have such an interest in the use of dedicated property, although not having any special property interests to be affected by a diversion of the use, that they may maintain an action to preserve the use.

Plaintiff has shown himself entitled to maintain the action to preserve the dedication of the strips, if such dedication was ever made.

The principal question is whether the evidence is sufficient to show that the board of county commissioners did dedicate the disputed area to the public use as a street, highway, or thoroughfare.

This question is raised in the fifth assignment of error, that the court erred in granting the defendant in error a permanent injunction and in holding that there was a dedication of the land in controversy as a public thoroughfare.

This requires an examination of the entire record to determine whether or not the finding and decree is against the clear weight of the evidence.

Dedication is the setting apart of land for public use. It is essential to every valid dedication that it should be accepted by the proper local authorities or by general public uses.

There are two general kinds of dedications: (1) Statutory dedication, and (2) common-law dedication. Elliott on Roads & Streets (4th Ed.) vol. 1, p. 140.

There is no claim that there was a statutory dedication; therefore, we need not discuss such dedication.

The distinction between statutory and common-law dedication is said to be that the former operates by way of grant, and the latter by way of estoppel in pais, rather than by grant.

Common-law dedications are by some authors subdivided into two classes: (1) Express dedications and (2) implied dedications. An express common-law dedication is one where the intent is expressly manifested, such as by ordinary deeds, recorded plats not executed pursuant to statute or defectively certified so as not to constitute a statutory dedication. There is no contention in this case that there was an express common-law dedication in the instant case. There is no evidence that there was.

"An implied common-law dedication is one arising by operation of law, from the acts of the owner. It may exist without any express grant, and need not be evidenced by any writing, nor, indeed, by any form of words oral or written. It is not founded on a grant, nor does it necessarily presuppose one, but it is founded on the doctrine of equitable estoppel." Elliott on Roads & Streets (4th Ed.) vol. 1, p. 169, sec. 137.

It is such a dedication that is relied upon by the plaintiff in this case.

"It is essential that the donor should intend to set the land apart for the benefit of the public, for it is held, without contrariety of opinion, that there can be no dedication unless there is a present intent to appropriate the land to public use. If the intent to dedicate is absent there is no valid dedication." Elliott on Roads & Streets (4th Ed.) vol. 1, p. 164.

"The intent essential to a valid dedication must be to vest an easement, at least, in the public. When there is nothing more than a mere license there is no dedication, where the use is merely permissive, with authority in the owner of the servient estate to put an end to the use at his pleasure, there is no dedication; nor in such case, are there such acts as will enable the courts to infer an intent. He, who claims against the owner of the fee an easement in lands, must show either a grant, a continued use for twenty years, or facts from which an intent to dedicate the land can be fairly inferred. While it is true that the intent to dedicate may be inferred from facts without proof of express declarations, yet it is also true that the facts must be such as indicate an unequivocal intent to devote the strip of land to public use. But the intent which must be shown to be unequivocal is that indicated by the acts, and not that conceived within the mind of the land owner." Elliott on Roads & Streets (4th Ed.) vol. 1, pp. 169-170, sec. 144.

These rules are generally applicable as against private individuals as owners. Dedication may not be presumed as against the state where the land is held by the state for a purely public purpose, and when the effect of dedication would be to create a way incompatible with that purpose or materially interfere with it.

"Public corporations, although they are really local governmental bodies, do not stand upon the same footing with the state, and dedication may be implied against them, under the like facts and conditions as in cases of individuals * * * whether the owner of the land be the state itself, or some one of the local political organizations of the commonwealth, there will be, it is obvious, in the very nature of its Constitution, and the tenure of its holding, an element which will always make the case unlike that of an individual landowner, and it cannot, therefore, be strictly correct that the rules are the same as those which apply in cases of individuals, but it is safe to say the rules are substantially the same." Elliott on Roads & Streets (4th Ed.) vol. 1, pp. 174-175, sec. 152.

With these general rules in mind we may then consider the evidence as to whether or not a dedication of the strip of land here in controversy is shown.

The acts relied upon by plaintiff in substance are: (a) The petitions filed seeking the opening of the street, but there was no action taken by the board, as such, upon these petitions. (b) Thereafter the board of county commissioners, as such, contracted for the removal of the remains of the courthouse that was burned. They were removed and the expenses were paid by the county. Thereafter the basement was filled and the ground leveled off, and this was at the expense of the county. Then the soldiers' monument was moved and the fish pond and shrubbery were removed. The

sunken gardens were filled, and the curbing along the streets across the width of the disputed area was removed by the county engineer by direction of the chairman of the board of county commissioners. Then the ground was leveled off and brought substantially to what would be the grade of a street, and drains and gutters on each side were made. This placed the strip in a condition where it could be used by the public as a street, and it was so used for some 20 months, to the extent of several hundred vehicles per day.

It must be borne in mind always that facts from which dedication may be implied are the acts and conduct of the landowner with reference to the property involved and the surrounding conditions. Considering the county as the owner, and the board of county commissioners as the only body authorized by law to handle and manage the property of the county, we are to consider only the acts of the board of county commissioners, acting as such, and not as individuals or individual members. It is safe to say that in every instance where the question of handling the business of the county or dealing with the property of the county has been before this court, it has been held that the county is bound only by the acts of the county commissioners as a body when in session, and that acts of the several members individually are not binding upon the county. Bd. of Co. Com'rs v. Seawell, 3 Okla. 281, 41 P. 592; Butler v. Bd. of Com'rs, 57 Okla. 748, 157 P. 912; Western Paint Co. v. Bd. of Com'rs, 161 Okla. 300, 18 P. (2d) 888; Bd. of Com'rs of Hughes Co. v. Busey, 166, Okla. 25, 25 P. (2d) 1098.

All three of the men who were members of the board from the date of the fire until July, 1933, were witnesses for the plaintiff, as was the then county clerk. The only action shown to have been taken by the board, as such, was the contract for the removal of the ruins of the burned courthouse.

E. N. Wells, the former chairman, testified in part:

"Q. I will ask you if at any time, from the time the courthouse burned during your term as county commissioner, there was ever any move made or resolution offered by you or any other members of the board of county commissioners while the board was in session, of which a record was made, opening that land in controversy across the courthouse square as a public street? A. Not that I know of. * * * Q. Was there any motion made or resolution offered by you or any other member of the board of county commissioners at a meeting of the board, while they were in session, of which no record was made, opening that land that is in controversy in this action, as a public street? A. We talked that over. Q. Just answer my question. I asked you if any motion was ever made or resolution offered? A. I don't think so. Q. You merely talked about it? A. Yes sir; we talked it over everything we did. Q. Did the board of county commissioners ever take any action on that matter while the county clerk was present and the board was in session, at its regular meeting place? A. I don't remember whether the county clerk was there or not. Q. Did you ever take any action as a board of county commissioners while they were in session to open that land across the courthouse square as a public street? A. I don't know that we took any action. Q. Now, Mr. Wells, the county paid all of the expenses of filling the basement, knocking out the curbs, removing the trees and obstructions and getting it opened there? A. Yes, sir. Q. And they paid the expense and maintained it; it was maintained by the county from the time the courthouse burned until the expiration of your term of office, wasn't it? A. Well, the most of the time we were out of money in that fund to where we couldn't take care of it a part of the time. Q. But as long as you had money in the fund for the maintenance of the courthouse grounds, you took care of it? A. Yes, sir. Q. You wasn't spending money out of that fund in the maintaining a public street in the city of Enid, were you? A. Well, I will say yes. Q. I will ask you, Mr. Wells, if you intended at any time during your term of office as county commissioner to dedicate that land to the city of Enid as a public street; that is. give it to them outright, as a public street? A. No, sir. Q. You never intended to do that, did you? Did you ever intend to give them that land to the city or to the public as a public street and relinquish the ownership and control over it during your term as county commissioner? A. We opened it as a public street. Q. Did you intend to retain it as county property and to maintain control over it? A. Yes, sir. Q. And you did that from the first day of your term to the last one, didn't you? A. Yes, sir; when we had the money. Q. You intended to keep it at all times as county property, didn't you? A. Yes, sir. Q. And you never at any time intended to relinquish control over it, but you intended that the county commissioners should retain control over it and ownership over it for the use of the county, is that correct?"

Mr. E. E. Way. a former member, on cross-examination testified:

"Q. Mr. Way, the board of county commissioners never took any actions in regular session at which a record was made to open that part of the courthouse. grounds as a

public street, did they? By the witness: A. They did not. Q. I will ask you if the board of county commissioners in regular session, in the commissioners' room, ever at any time took any action to open any part of the courthouse grounds as a public street for the use of the public, of which no record was made? A. I don't think we ever did. Q. There never was a resolution or motion made by anyone as a member of the board of county commissioners, at a commissioners' meeting, when the commissioners were in session, at their regular meeting in their regular meeting place, to open that as a street for the use of the public or to dedicate it to the city of Enid as a public street, was there? A. Not to my knowledge. Q. I will ask you, Mr. Way, if you, as a member of the board of county commissioners, had any intentions in the work you did, or the connection you had with it, to dedicate that part of the courthouse grounds to the city of Enid as a public street? A. I never had any intention to; I never thought of it in that light; I thought of it as opening it up for the benefit of the traveling public."

The testimony of L. G. Gossett, the other member, was to the same effect, and also that the board of county commissioners never did relinquish control over or turn control of the strip to the city officials; that in fact the county always did retain control over the strip as long as he was a member of the board.

The only action ever taken by the board as such, was the removal of the ruins of the old courthouse. This, of course, would have been necessary in order to open the street, but it also would have been necessary in order to build a new courthouse on the site of the old one. So no intent to dedicate the land as a public street could be implied from this act. The removal of the soldiers' monument and the tearing out of the curbs were done under and at the direction of the chairman of the board, in the presence of the other members, but not as a board. The filling of the basement was done at public expense, but this was only an ordinary act incident to the proper maintenance of the courthouse grounds, and was proper and perhaps necessary if no street had been opened.

"One of the principal things to be established by a party who claims a way by virtue of dedication is, as we have seen, the intent to dedicate, the animus dedicandi. In all cases * * * the intention must be satisfactorily shown. It is not necessary * * * that the evidence on this point should be conclusive. It is enough if the intention be proved by evidence of a satisfactory character. The intention to dedicate must be clear and unequivocal, and this the evidence must show, but the evidence need not be of a different probative force than that in other cases involving the title to land, although it is frequently said that the evidence itself must be unequivocal and convincing." Elliott on Roads & Streets (4th Ed.) vol. 1, p. 205.

The rule as to the requisite proof of intention to dedicate is well stated in Lewis v. City of Portland (Ore.) 35 P. 256, wherein it is said:

"A dedication of land to the public use rests on the intention or assent of the owner. As it is purely a question of intention, the evidence of it, when resting in parol, must be clear and satisfactory, and indicate a positive and unmistakable intention to devote the property to public use. All the authorities agree that the acts and conduct of the owner, when relied upon to show the dedication of his property, must be deliberate and unequivocal, manifesting a clear intention to abandon such property to the public use. * * * The security of titles requires that the evidence of dedication, when depending on parol proof, should be of such a deliberate and decisive character as to leave no doubt of the owners' intention. Hence the rule is well settled by numerous authorities that before there can be a valid dedication there must have been an actual intention, clearly indicated, by deliberate and unequivocal words or acts, to dedicate the property to the public."

The intention to dedicate may be established by proving an express contract, or language of the donor, or it may be inferred from his conduct.

There being no express contract in the instant case, the plaintiff must rely upon the language or conduct, or both, of the county. And therein arises a difference in the rule to be applied between a public corporation and that applied to an individual landowner. Of necessity this must be true. The language of this public corporation can be only that of the board of county commissioners, acting as a body, when in session. This may be shown by the record of proceedings of the board, which the law requires to be kept by its official clerk, the county clerk. We do not mean to say that if official action is taken by resolution, motion or otherwise, and the county clerk neglects or fails to make a record thereof, that such action may not be proved by parol testimony. It is not necessary to determine that question here, for it is conceded that no official action was ever taken by the board when in session, by resolution, motion, or otherwise, toward the opening of the street or highway here involved. State-

ments made or acts performed by the conduct of individual members of the board are not the acts, statements, or the conduct of the board of county commissioners, and the intention of the county to dedicate the land as a public street may not be shown thereby. Measured by this rule, the findings and decree of the trial court cannot be sustained, for there is not sufficient evidence in support thereof. The only official action by the board of county commissioners shown by the evidence is not inconsistent with an intent to retain in the county possession and control, as well as title to the land in controversy.

The evidence at most shows a permissive use or mere license to use the land with authority in the county at any time to put an end to the use. And, as heretofore stated, when there is nothing more than a mere license, there is no dedication. Therefore, conceding, but not deciding, that it was within the power of the board of county commissioners to dedicate the land in controversy to the public as a street, highway, or thoroughfare, there is not sufficient evidence to show that it did so. It is not necessary to consider the other question; that of the power of the board of county commissioners to irrevocably dedicate land to a certain public use, to wit, city street purposes, when such land is already dedicated to a different public use, to wit, courthouse purposes, and held by the county.

The finding of the trial court to the effect that the acts of the present board of county commissioners in submitting to the people for their vote three proposed sites for the location of the new courthouse is conclusive evidence that the use for which lot 1 was held by the county would not be interfered with by dedicating the strip across same as a public street, cannot be sustained if it be conceded that such election was a nullity. If we are to consider the acts of the board of county commissioners in connection with the submission of said question to the voters as binding upon the county, it is but fair to consider the result of the election; the expression of the people, the real owners of the land in controversy. The voters by a plurality of 1,170 votes expressed a preference for the site of the old courthouse on the area here involved.

The finding of the trial court that the use of said strip of land as a public street does not interfere with the use of said land for courthouse reserve for county courthouse, jail, or other county purposes cannot be sustained. It may be true that there is ample room north of said street, or possibly south of it, to build a courthouse of the dimensions now deemed sufficient for the needs of the county. But mere occupancy of the space owned by the buildings is not all that is to be considered. Ordinarily much more space than that actually occupied or necessary to be occupied by buildings is set apart to counties for courthouse reserves. The extra space is commonly used for the purpose of ornamenting and beautifying the public buildings and grounds. Very often such space is used for public gatherings and other purposes in which the public generally has an interest. In fact one building, public or quasi public in use, is now located in the north part of said public square. It is used as an American Legion building and also a county marketing building. Originally, in 1893 or 1894, four acres were deemed necessary for a courthouse reserve in the then new county. Since that time the population of the city of Enid, the county seat, and that of the county of Garfield has increased enormously. The entire lot appears to have been improved and beautified and it had been used as a whole for courthouse and other public purposes by the county for some 25 years. It is difficult to understand how it could be possible to open a public street 110 feet wide across said lot, leaving a tract 160 feet wide and 320 feet long on the south side and one 286 feet wide and 320 feet long on the north side thereof, and say such would not be inconsistent with the purposes for which the lot as a whole was held by the county. The very division of the courthouse reserve into separate tracts as would here result would necessarily interfere, in some degree, with the use of the courthouse reserve for the purpose for which it was held by the county.

There being no statutory dedication and no specific dedication, the evidence being wholly insufficient to show an implied dedication, the judgment and decree is reversed and the cause remanded, with directions to enter judgment dismissing the petition.

CULLISON. V. C. J., and ANDREWS, McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. SWINDALL, J., not participating.