Argued October 12, 1954, affirmed as modified February 23, 1955

# PORT OF PORTLAND *v.* REEDER ET AL
280 P. 2d 324

372

*William F. White,* of Portland, argued the cause for appellants. With him on the brief were White, Sutherland and Parks, and Thomas J. White, of Portland, and Paul M. Reeder, of Hillsboro.

*Erskine Wood,* of Portland, argued the cause for respondent. With him on the brief were Wood, Matthiessen, Wood & Tatum, of Portland.

Before LATOURETTE*, Chief Justice, and WARNER**, ROSSMAN, BRAND, TOOZE and PERRY, Justices.

BRAND, J.

The plaintiff Port of Portland brings this suit to enjoin the maintenance by the defendants of houseboats and moorage structures on the river side of a harbor line established by the Port along the northeasterly bank of the Willamette River at the Swan Island Basin. Defendants contend that the Port Ordinance establishing the harbor line is invalid and that the defendants have property rights which cannot be destroyed

---

* Chief Justice when this case was argued.
** Chief Justice when this decision was rendered.

without just compensation. They allege that they are the owners of certain land, without describing it, with structures thereon "consisting of piling, dolphins, boardwalks, boat hoists, piping, etc., located on said defendants' land, and extending out to the navigable waters of the Willamette River * * *." To these structures houseboats are moored.

After trial upon the merits the court issued a decree enjoining the defendants from maintaining the moorage and other structures and houseboats outside of the line established by the Port. The ownership of land by the Reeders on the east bank of the river is not disputed.

The defendant Reeder and wife are the grantees in a deed which purports to convey to them real property in the city of Portland, county of Multnomah, and lying within the boundaries of the Port of Portland, a public corporation. The real property therein described is adjacent to the Willamette River, the southerly or southeasterly boundary line being described as running to and along the harbor line as established by the United States Government Engineers. The deed bears date of 4 November 1946. The deed recites that it is "subject to the right, title and interest of the State of Oregon in and to that portion of said premises lying below the line of ordinary low water in the Willamette River and of ordinary high water of the navigable portion, if any, of Mock's Slough." The said land lies on the east or right bank of the river and the defendants Reeder have for some years maintained a moorage for houseboats in the river in front of said land and adjacent lands. The defendants other than Reeder and wife are the owners or occupants of houseboats or similar structures moored at the said moorage claimed by the defendants Reeder. Unless otherwise indicated, we shall refer to the Reeders as the defendants.

The Willamette River is a navigable stream which flows into the Columbia River and thence to the ocean. The defendants' land lies on the right bank and fronts upon the so-called Swan Island Basin for a claimed distance of 800 feet. It lies along the outer radius of a sharp left turn in the river and just off the downriver end of Swan Island. The bend in the river is at the entrance from the main river to the Port of Portland Drydock and Ship Repair Basin.

In 1942 the shipyard and drydock were built by Henry Kaiser at the foot of Swan Island. Thereafter the Port of Portland acquired the facilities. Since then the Port has built a finger pier out from the downriver end of the island. The immense importance of the Swan Island Basin and of the improvements thereon, owned and operated by the Port, can be seen from the fact that between July 1, 1951 and June 30, 1952, 106 vessels entered the drydocks and 209 other vessels entered the Basin, making a total of 315 vessels which entered and left the Basin. Thus there were 630 passages in or out thereof in one year. These vessels varied in size from 100 feet to 523 feet in length. The distance across the narrowest part of the channel is 520 feet. The ships are maneuvered into the Basin or the drydocks by the aid of a tow boat lashed to the stern of the ship, so that in the case of large seagoing vessels, the combined length of the ship and the stern-wheeled tow boat is from 623 to 648 feet. Other and smaller tug boats are sometimes required to aid in maneuvering the ships. These facts are convincingly illustrated by photographic exhibits introduced by the plaintiff. The distance at the narrowest point between the harbor line on Swan Island and the newly established harbor line on the right bank of the river in front of the Reeders' property is approximately 600 feet. The rela-

tive position of the lower end of Swan Island with its pier and other facilities, on the one hand, and the easterly bank of the river with the defendants' moorage facilities and houseboats, on the other, is indicated by the picture which is here reproduced from a photograph introduced in evidence by the defendants.

Exhibit 10 is a large chart showing Swan Island and the piers extending therefrom; the land of the defendants Reeder on the right bank; the high-water line on the date that the survey was made; the harbor line established by the Port; the harbor line established by the United States Engineers; and the houseboats.

The evidence does not fix the *ordinary* high-water line fronting defendants' property. In the season of the spring run-off, high water extends landward further than shown on the survey, and at dry seasons, high-water line lies more riverward than shown by the survey. The harbor line established by the Port substantially coincides with the high-water line as surveyed on 21 February 1952. Since we cannot determine from the evidence where the ordinary high water line lies *(Taylor Sands Fishing Co. v. Land Board,* 56 Or 157, 108 P 126; *Sun Dial Ranch v. May Land Co.,* 61 Or 205, 119 P 758) we cannot determine whether the harbor line cuts across lands above the ordinary high-water line. It is clear, however, that the harbor line established by the Port was surveyed, as is usual, with official meander lines. While it substantially conforms to the high-water line of 21 February 1952, it does not follow every curve and sinuosity of the water line. The defendants complain that it appears to run in part over high ground, and to a slight extent this may be possible, but we do not construe to be the intention of the Port to impose any limitations upon the right of defendants to use any part of their land, if in fact it is above *ordinary* high-water line. Nor is there any intention to exclude the defendants from access to the river. What we shall call the United States Harbor Line runs riverward from the Port's line, the distance between the two lines varying from zero to 150 feet. The result of the removal of the defendants' houseboats and structures and the clearing of all obstructions between the two lines and back as far as the Port line would be to widen the unobstructed area at the bend of the river by distances from zero to 150 feet. The survey upon which Exhibit 10 is based establishes that the houseboats now lie on the river side of the United States

Harbor Line, though the dolphins, piles, etc., are chiefly, if not wholly, maintained landward of the United States line and riverward of the Port line. It would be lawful but impractical to build or use a dock from the defendants' upland if it terminated at the Port Harbor Line, unless dredging were done at the end of the dock. However, the widening of the river by the establishment of the new harbor line implies that the widened channel will be rendered fit for navigation.

The evidence indicates that strong winds frequently make difficult the maneuvering of the vessels within the limited area of the Basin. Even the defendants admit "that some damage has occurred to some of the said houseboats and other structures due to vessels attempting to enter or leave said drydock or basin." We think that if there is danger to houseboats from the ships, it is reasonable to infer that there is also danger to the ships from houseboats and other structures, or at least, that they constitute obstructions and a menace to navigation.

■ We have examined all of the testimony with care and are convinced that the Port authorities were supported by substantial evidence and did not act arbitrarily in determining that the houseboats and moorage facilities constituted in point of fact both a hazard to and an obstruction of navigation. We shall not further discuss the evidence upon this point.

The following facts relevant to the issue are set forth in chronological order:

1904 or prior thereto. United States Army Engineers established the United States Harbor Line.

1937. The Secretary of War gave a permit to the predecessors in title of the defendants. The application was for the approval of plans for "an existing boat hoist [piling] channelward of the established harbor line

\* \* \* in the Willamette river lower.'' At the top of the permit the following statement is made:

> ''Note.—It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining *State assent* to the work authorized. IT MERELY EXPRESSES THE ASSENT OF THE FEDERAL GOVERNMENT SO FAR AS CONCERNS THE PUBLIC RIGHTS OF NAVIGATION. (See Cummings v. Chicago, 188 U.S. 410.)''

The plans were approved subject to certain conditions, among which were the following: (1) That no attempt shall be made by the occupant or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to said structure. The second condition provided that if, in the opinion of the Secretary of War, it should be found that the structure caused unreasonable obstruction to free navigation of the water, the owner shall, upon due notice, cause the structure to be removed without expense to the United States.

3 February 1945. On this date a permit was issued by the Commission of Public Docks (not the Port Commission). The permit was made subject to all ordinances relative thereto and to approval of the fire marshal according to City Ordinance No. 47,284. It authorized the construction of a floating shop on the east bank of the Willamette River at ''Aviation Moorage, Ft. N. Olin Ave. on East Bank of Willamette River.'' The application was made by William Gazeley, predecessor in interest of the defendants. The application was made further subject to the approval of the

Bureau of Buildings according to City Ordinance No. 33,911. The exact location of the structure authorized by the permit is not set forth.

1945 or 1946. The Port acquired the facilities on Swan Island and further improved the same.

4 November 1946. The defendants purchased their property.

14 April 1952. The Port of Portland by ordinance established a harbor line on the Willamette River fronting the lands owned by the defendants. The ordinance establishing said line reads in part as follows:

"Section 1. WHEREAS, the Port does hereby determine that to better facilitate navigation in the Willamette River between Swan Island and the northeasterly bank of said river in Section 17, 18, 20 and 21, T 1 N, R 1 E of Willamette Meridian and to prevent unnecessary hazards to navigation, requires a greater width of the navigable waters free from obstructions on the northeasterly side; and

"Section 2, WHEREAS, there are no improvements or facilities for the use and service of navigation on the said northeasterly side of the Willamette River in said area, now, therefore, in pursuance of the power and authority vested in The Port of Portland by the laws of the State of Oregon, particularly by Section 105.604, O.C.L.A., The Port of Portland does hereby establish a harbor line, landward of the harbor line heretofore established on the said northeasterly side of the Willamette River, the position and courses of which are described as follows, to-wit:

"Beginning at the angle point in the existing harbor line heretofore established by the Secretary of War, with coordinates of North 10,428.23 and West 5977.47; thence S. 89° 53' E., 63.77 feet; thence N. 38° 15' W., 1693.75 feet; thence N. 52° 15' W., 5855.21 feet; thence S. 76° 29' W., 440.29 feet; thence S. 51° 06' 30" W., 349.72 feet to the angle point in

the said existing harbor line with coordinates of North 15020.37 and West 12,292.18.

"Section 3. From and after the effective date of this Ordinance no structures or obstructions of any kind shall be placed or maintained in the Willamette River outward, i.e., on the river side of said harbor line described in Section 2 of this Ordinance."

9 June 1952. The Port Commission passed the following resolution:

"RESOLVED, that the moorage of houseboats and similar objects in Swan Island Basin outside the harbor line established by Ordinance #56 of The Port of Portland, duly passed April 14th, 1952, and now in full force and effect, constitute a serious menace to navigation and the said houseboats and all similar structures, whether floating or fixed, constitute obstructions, the placing or maintenance of which is forbidden by Section 3 of said Ordinance, and are a public nuisance, and the General Manager and the attorneys for the Port are hereby instructed to take all necessary steps, including actions at law or suits in equity, to cause the removal of said houseboats and similar structures and the cessation of the use of said waters outside said harbor line as a houseboat moorage."

9 July 1952. The Port of Portland filed in the Circuit Court for Multnomah County the complaint in the pending case.

15 January 1953. The Circuit Court entered a decree herein enjoining the defendants from maintaining their moorage for houseboats outside of the harbor line established by the Port of Portland on the Swan Island Basin, and enjoining the defendants from mooring houseboats outside of said harbor line or permitting others to do so. Defendants were specifically enjoined from maintaining or mooring houseboats after 22 April 1953 and outside of the harbor line above-mentioned.

10 March 1953. The defendants appealed from the decree of the Circuit Court.

13 May 1953. Chapter 713, Laws of 1953 (ORS 778.090) adopted by the Legislature, was approved by the Governor. The act became effective on 21 July 1953.

Prior to its amendment in 1953 the statute defining the powers of the Port of Portland was as follows:

"To the full extent to which the state of Oregon might itself exercise such control, or to which it can grant to the said the Port of Portland the right to exercise the same, the said the Port of Portland shall have and is hereby granted full control of the Willamette River in the harbor at the city of Portland and of the Oregon and the Columbia Sloughs and of the Willamette and Columbia Rivers between said harbor and the lower ends of the channels of the Oregon and the Columbia Sloughs, and the sea, with full power and authority to from time to time make, establish, change, or abolish wharf lines of, in, and for the harbor in the city of Portland, or on the Oregon and the Columbia Sloughs, and to make, establish, change, modify, or abolish such rules and regulations for the use of navigation of said harbor in said city of Portland or on the Oregon and Columbia Sloughs, or of the said Willamette and Columbia Rivers or Oregon and Columbia Sloughs between said harbor and the lower ends of the channels of the Oregon and the Columbia Sloughs and the sea, or the placing of obstructions therein, or the removal of obstructions therefrom, as it may deem convenient, requisite, or necessary, or in the best interests of the maritime shipping or commercial interests of the said the Port of Portland, and the said rules and regulations so made by it, to enforce by such fines, penalties, and punishments as it in the exercise of a sound discretion, may deem necessary; and the fines and penalties so imposed or levied shall be recoverable in the name of the said the Port of Portland in any court of this state having

jurisdiction of actions for the recovery of fines or penalties imposed by state laws, and shall inure and belong to the said the Port of Portland, to go to and form part of its general fund; and all punishments so imposed shall be enforced in the name of the said the Port of Portland in any court of this state having jurisdiction of crimes and misdemeanors under state laws; provided always, that nothing herein contained shall be so construed as to permit of the removal of bridges or other obstructions existing by virtue of a grant by this state of express authority therefor, or so as to permit of excluding other cities, or towns other than the said city of Portland from free access to the channel of either the Willamette or Columbia Rivers or the Oregon and the Columbia Sloughs, or the free use of the same for the purpose of navigation; and that in all cases of adjoining owners, where it shall be necessary to create artificial banks to narrow the general channel of the river or slough, all new lands made shall belong to said adjoining owner and his right shall extend to the new channel the same as to the old, save where, by reason of his refusal to consent to the erection of the works necessary, it may have been necessary to condemn or take his land or rights under the exercise of the right of eminent domain as herein provided to be done." OCLA, § 105-604.

The foregoing statute appears as ORS 778.085 and 778.090 (1) subject only to changes in phraseology which do not change legal effect. The 1953 amendment to OCLA, § 105.604 added the new provision on which defendants rely. It appears in Oregon Revised Statutes as follows:

"In all cases of adjoining owners, where it shall be necessary to widen the general channel or improve the navigation of the river or slough mentioned in subsection (1) of ORS 778.085 by requiring the removal or destruction of moorage facilities for houseboats, boathouses or pleasure craft in such

river or slough, or by establishing or re-establishing wharf lines that have the effect of destroying or impairing the riparian rights of said adjoining owners, said adjoining owners or others owning such moorage facilities shall be reasonably compensated for the removal or destruction of such moorage facilities and for the destruction of such moorage facilities and for the destruction or impairment of said riparian rights; and shall not be required to remove or destroy said moorage facilities in absence of reasonable compensation therefor. The Port of Portland is authorized to condemn said moorage facilities or riparian rights or the real property of said adjoining owners under the exercise of its right of eminent domain.'' ORS 778.090, (2).

The first contention of the defendants is that they had acquired vested property rights entitling them to maintain houseboats and moorage facilities in their present location. If this claim should be held valid it would become unnecessary to consider the difficult issues concerning the construction and constitutionality of ORS 778.090 (2). We shall therefore first consider the claims of vested right. It is clear that the defendants can make no claim to a vested right growing out of the revocable permit issued by the Secretary of War. It related only to a boat hoist and was subject to ''state assent.'' Nor can such a claim be based on the indefinite permit issued by the Commission of Public Docks. It related only to a ''floating shop'', the location of which with reference to the harbor lines, was not specified in the permit. It too was subject to permission being secured from other authorities, which permission has not been shown. The defendants contend that the moorage facilities constitute ''wharves'' within the contemplation of statute and common law, and that when constructed they became vested rights which cannot be destroyed without compensation.

A statute of 1862 provides:

"The owner of any land lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town, may construct a wharf or wharves upon the same, and extend the wharf or wharves into the stream or other like water beyond low-water mark so far as may be necessary and convenient for the use and accommodation of any ships, boats or vessels that may or can navigate the stream or other like water." ORS 780.040.

"The corporate authorities of the town wherein the wharf is proposed to be constructed may regulate the exercise of the privilege or franchise granted in ORS 780.040. Upon application of the person entitled to and desiring to construct the wharf, the corporate authorities shall, by ordinance or other like mode, prescribe the mode, and extent to which it may be exercised beyond the line of low-water mark, so that the wharf shall not be constructed any farther into the stream or other water beyond the low-water line than may be necessary and convenient for the purpose expressed in ORS 780.040 and so that it will not unnecessarily interfere with the navigation of the stream or other like water." ORS 780.050.

■■ We are in accord with the opinion of the learned trial judge that the piling, dolphins, boardwalks, piping, etc., described in the defendants' answer do not constitute a wharf or wharves. A fortiori, the houseboats used as dwellings and attached to such facilities are not wharves.

"A 'wharf' is a structure of timber, masonry, cement, earth or other material, built on shore or margin of harbor, river, canal, or other navigable water, so that vessels can be brought alongside it to receive and discharge cargo, passengers, etc." *A.E.F.'s, Inc. v. City of New York,* 58 NYS2d 90, 93, 185 Misc. 812.

*Lewis v. City of Portland,* 25 Or 133, 35 P 256; *Harris v. City of St. Helens,* 72 Or 377, 143 P 941; *Westcott v. American Creosoting Co.,* 86 NJEq 104, 97 A 493; *City of Dubuque v. Stout,* 32 Iowa 47; *John J. Sesnon Co. v. United States,* 182 Fed 573, 576; *Langdon v. City of New York,* 93 NY 129, 151; *Prior v. Swartz,* 62 Conn 132, 138, 25 A 398; *Geiger v. Filor,* 8 Fla 325, 332.

■ The defendants concede that cargo and passengers are not discharged at the defendants' moorage, but they add that the boats and craft are harbored and protected from the current and tide. Surely the houseboats cannot be considered any part of a wharf.

■ As indicated by the cases cited, we think the statute, in employing the term "wharf", had reference to substantial and permanent structures built out from the upland and forming an extension thereof. The principal, if not the sole purpose of the piling, piping and floating boardwalks, was to obtain access to floating residences, and in that respect these facilities are to be distinguished from wharves.

In support of the defendants' contention that the facilities at Reeders' landing were wharves, the case of *Siebel v. Pleayl,* 172 NYS 798, is cited. That case is said to hold that walks and structures erected to accommodate houseboats constitute wharf property. This is not strictly according to the holding of that case. The court referred to the words "property" *and* "wharf property", which were found in the statute as including walks and structures of the kind mentioned. The defendant also relies upon *Woodruff v. One Covered Scow* (1887), 30 F 269. That case is not in point.

■ Even assuming, contrary to fact, that these moorage facilities and houseboats are wharves, it would not follow that the defendants can claim any benefit

from the provisions of the statute cited supra. Section 780.040 of ORS must be construed with 780.050. When they are considered together it is apparent that the owner of land lying upon a navigable stream within the corporate limits of a town may construct a wharf or wharves only upon application made to the corporate authorities of the town. When such application is made, the corporate authorities may prescribe the mode and extent to which the right to construct a wharf may be exercised. The duty is imposed upon the corporate authority to permit no wharf which would unnecessarily interfere with the navigation of the stream or other like water. There is nothing to indicate in this case that application has ever been made to the city of Portland for permission under the statute to erect a wharf or that any permit by ordinance or otherwise has ever been given for that purpose. We do not construe the statute to mean that the private riparian owner may, without permission, construct a wharf into navigable water within a city or town in such manner as to unnecessarily interfere with navigation and acquire a vested right by doing so.

The defendants next contend that they acquired vested rights to maintain their moorage facilities and houseboats at their present location even if those facilities and boats do not come within the provisions of the statute which we have just considered. They rely upon the holding in *Coquille Mill & Mercantile Co. v. Johnson*, 52 Or 547, 98 P 132. That case is distinguishable in many respects. The plaintiff brought an action of ejectment to recover possession, of "real property" inclosed by a boom in the navigable waters of the Coquille River near the city of Coquille. The boom was attached to piling driven in the river. The plaintiff was the lessee of a booming privilege and the defendant was the

riparian owner. Judgment for the defendant was affirmed. The court said:

"* * * But 'riparian owners upon navigable fresh rivers and lakes may construct, in the *shoal water* in front of their land, wharves, piers, landings, and booms, in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank and not upon title to the bed of the river. Its exercise may be regulated or prohibited by the State; but, so long as not prohibited, it is a private right, derived from a passive or implied license by the public. * * *' " (Italics ours.)

The plaintiff claimed title by adverse possession but the court held that the plaintiff was estopped to attack the title of its lessor. It was also held in that case that the plaintiff's claim was not adverse to the ownership by the state of the fee to the bed of the stream. Whether title to the bed of the stream could in any case be divested by adverse possession was not decided. The state was not a party to the case and there was no discussion by the court concerning the right of a riparian owner to obstruct navigation, nor was there any claim that the boom constituted such an obstruction. The court in its opinion referred to wharves and booms and did not in any way indicate that a "wharf" is to be construed as including "boom." The boom was not located within any city or town having regulatory government authority and was not regulated by any statute, as is the case concerning wharves.

The defendants, as upland owners, derived their title through mesne conveyances from the United States. The patent to the uplands was issued in 1866 and vested the grantee with title to, but only to, ordinary high-water mark of the Willamette River. The State of Oregon, on admission to the Union, acquired title to the bed of navigable streams and to tidelands

wholly within the state. *Bowlby v. Shively,* 22 Or 410, 30 P 154; *Shively v. Bowlby,* 152 US 1; *Gatt v. Hurlburt,* 131 Or 554, 284 P 172; *Atkinson v. State Tax Com.,* 156 Or 461, 62 P2d 13, 67 P2d 161; *Winston Bros. Co. v. State Tax Com.,* 156 Or 505, 510, 62 P2d 7; *Columbia Fishermen's Union v. St. Helens,* 160 Or 654, 87 P2d 195; *State v. McVey,* 168 Or 337, 121 P2d 461, 123 P2d 181. The defendants had such rights as inhere in riparian owners on navigable water, subject to the limitations hereinafter set forth.

■ In 1876 the Legislature of Oregon passed an act entitled:

"AN ACT to amend an Act entitled an Act to amend an Act to provide for the sale of Tide and Overflowed Lands on the *Seashore and Coast.*" (Emphasis ours.)

After authorizing the sale and purchase of tidelands, the statute continued:

"* * * Provided further, That the Willamette, Coquille and Coos rivers shall not be deemed rivers in which the tide ebbs and flows within the meaning of this Act, or of the Act to which this Act is amendatory; and the title of this State to any tide or overflowed lands upon said Willamette, Coquille, Coos and Umpqua rivers is hereby granted and confirmed to the owners of the adjacent lands, or when any such tide or overflowed lands have been sold, then in that case, to the purchaser or purchasers of such tide or overflowed lands from such owner of such adjacent lands, or some previous owner thereof, as the case may be.

"Approved October 21, 1876." Laws of Oregon, 1876, p 70.

This act was repealed by the Laws of 1878, p 54. Thereafter the initial validity of the act of 1876 was challenged as violative of Oregon Constitutional Article

IV, § 20, because of the alleged insufficiency of the title which referred only to lands "on the Sea-shore ánd Coast." The land in question was on the Willamette River which flows into the Columbia River 100 miles from the ocean, but this court, by Justice BEAN, remarked "That that portion of the country which drains into the Pacific Ocean is frequently spoken of as the 'Pacific Coast.' " The act was held to be within the title. *Pacific Elevator Co. v. Portland,* 65 Or 349, 384, 133 P 72. After this lapse of time we defer to that decision and must therefore hold that the tide or overflowed lands on the Willamette River vested in the defendants' predecessors in title before the act was repealed and the defendants now own such rights as inhere in an upland owner plus such rights as were acquired under the law of 1876 supra. *State v. Imlah et al.,* 135 Or 66, 294 P 1046; *State v. McVey,* supra.

The evidence is incomplete and unsatisfactory as to the actual location of the low-water line fronting the defendants' land, but most of the facilities and all of the houseboats are certainly riverward of the low-water line. The evidence discloses that the water has a depth of 30 feet immediately adjacent to the houseboats and that the land occupied by the defendants' facilities is low-lying with a gradual slope such that a loss of one foot in depth of water may in places lay bare three or four feet of land. The effect of the ebb and flow of the tide is very small and is apparently limited to about two feet. The photographs and evidence concerning the survey line which was made on 21 February 1952 indicate that the area involved in this controversy lies riverward of the "tide and overflowed lands" which the defendants can claim under the Laws of 1876.

█ We will now consider the extent to which an upland owner, who is also the owner of the tide and over-

flowed lands fronting thereon, may be subject to control by governmental authority in the interest of navigation. In *Pacific Elevator Co. v. Portland,* 65 Or 349, 133 P 72 (1913) this court said:

"The paramount right of navigation which is vested in the state and also in the general government of the United States by virtue of the authority conferred upon it to regulate commerce between the states and with foreign nations is receiving constant elucidation by the courts, but no fixed rule can yet be laid down defining the extent to which the federal government or the state may interfere with the property of riparian and other owners without becoming liable for compensation: Dillon, Mun. Corp. (5 ed.), § 265." 65 Or at 381.

It must first be pointed out that even if the defendants own some tide and overflowed lands in the area in controversy, that fact is not determinative as to the right of the defendants to maintain on such lands obstacles to free navigation of the river. The problem was considered in the early case of *Hinman v. Warren,* 6 Or 408 (1887). The court said:

"As the state became owner of the tide lands, it had the power, under the provisions of the act providing for the sale of such lands, Mis. Laws, p. 644, to sell the same. It has, however, no authority to dispose of its tide lands in such a manner as may interfere with the free and untrammeled navigation of its rivers, bays, inlets and the like. The grantees of the state took the land subject to every easement growing out of the right of navigation inherent in the public." *Hinman v. Warren,* 6 Or 408 at 411.

In the famous case of *Bowlby v. Shively,* supra, (1892) the issue was between the upland owner and the owner of the tidelands acquired from the State of Oregon. As between the two parties, the right to build

a wharf was held to be vested in the owner of the tide-lands. There was no controversy as to the existence of any menace to navigation or any obstruction thereof. However, the court referred to the law which had existed in England from the earliest times, and recognized the early distinction between the *jus privatum* and the *jus publicum*, the one being vested in the Crown and the other in Parliament. The right of the Crown could be conveyed but the dominion and control over the waters in the interest of commerce and navigation was limited to control by Parliament. In its opinion the court repeatedly recognized that the right of the tideland owner to construct a wharf is "subject, of course, to the paramount right of navigation secured to the public." The court quoted with approval the following, speaking of the state:

> "It has, however, no authority to dispose of its tide lands in such a manner as may interfere with the free and untrammeled navigation of its rivers, bays, inlets and the like." 22 Or 410 at 417.

The case was affirmed by the United States Supreme Court in *Shively v. Bowlby*, 152 US 1. It would seem that if the state cannot expressly dispose of tide or overflowed lands in such manner as to interfere with the untrammeled navigation of its rivers, that it should also be held that it cannot by its laches permit the acquisition of property rights which it could not expressly confer.

In *Portland v. Montgomery*, 38 Or 215, 62 P 755, the plaintiff city brought suit to enjoin the defendant from constructing a wharf. The Harbor Line was established in 1892 by the Secretary of War. The defendant Montgomery petitioned for a change in the line, alleging that it was too far inland and was at many points in water from six inches to two feet deep. The

petition was allowed and the United States Harbor Line was reestablished riverward of the old line to permit Montgomery to construct a wharf out toward the channel to the new line, and beyond the old one. He immediately commenced construction of the wharf, whereupon the Port of Portland passed a resolution declaring that the original harbor line curtailed the navigable waters to the full extent that could be done in the interest of shipping, and it then established a port line landward of the reestablished United States Harbor Line. The defendant Montgomery was ordered to cease construction of his wharf beyond the port line and to remove any piling or other obstruction which extended beyond the port line. Plaintiff sued for an injunction. Defendant relied on the alleged right to build riverward to the United States Line. The trial court found for defendant and the plaintiff appealed. This court, by Chief Justice ROBERT S. BEAN, said:

"It is not alleged in the complaint that the proposed wharf will be an obstruction to, or in any way interfere with, the navigation of the river, or with any of the powers and duties of the Port of Portland; but such is the necessary inference, *prima facie*, at least, from the resolutions forbidding its construction, the fact that it will extend beyond the wharf line as established by the city, and that its erection is in violation of an ordinance thereof.

"The defendant's right to construct a wharf in front of his property is subject to the power of the corporate authorities to 'prescribe the mode and extent to which the same may be exercised beyond the line of low-water mark.': Hill's Ann. Laws, § 4228; Portland City Charter, Laws 1891, p. 805, § 16; 29 Am. & Eng. Enc. Law (1 ed.), 69; Lewis v. City of Portland, 25 Or 133 (46 Am. & Eng. Corp. Cas. 230, 42 A.St.Rep. 772, 35 Pac. 256, 22 L.R.A. 736).

"And it will be assumed that the regulations

prescribed by the municipal authorities are reasonable and valid, until the contrary is made to appear." 38 Or at 222.

The decision of this court was affirmed in *Montgomery v. City of Portland,* 190 US 89, 47 L ed 965.

In *Montgomery v. Shaver,* 40 Or 244, 66 P 923, the contest was between adjoining riparian owners, and it again related to the right to the construction of a wharf. Concerning the 1862 statute, now ORS 780.050, supra, authorizing cities and towns to regulate the wharfing privilege, the court said that the power of regulation pertains to the extent to which wharves may be built out into the channel of a stream "so as not to obstruct or impede navigation" and that such statute constituted authority for the establishment of wharf lines. The court held that one riparian owner could obtain title by adverse possession as against his adjoining owner, but it also held that the mere fact that the defendants had driven piling which extended beyond the line which divided plaintiff's rights from those of the defendants, was not sufficient to establish right by prescription to maintain a wharf there. It would seem that if the maintenance of piling for ten years was insufficient to establish prescriptive right against an adjoining owner, it would surely be insufficient to establish a vested right as against the public, if such piling interfered with the public rights of navigation. There was no assertion in this case of any rights as against the public to maintain an obstruction to navigation. The court said that the statute authorizing the construction of wharves (ORS 780.040) constitutes a license revocable at the pleasure of the Legislature, until acted upon. This would imply that if acted upon, a vested right might accrue. But it was pointed out

that ORS 780.050 was enacted to regulate the building of wharves—not to extend the right or license recognized and granted by ORS 780.040, and it was nowhere intimated that a vested right to unreasonably obstruct navigation could be acquired.

A similar problem was considered in the case of *Lewis v. City of Portland*, 25 Or 133, 35 P 256, 22 LRA 736. There the plaintiffs brought a suit in equity to enjoin the city and others from appropriating to public use without compensation to the owners a strip of land in the City of Portland, which was described as including a wharf extending to a navigable water of the Willamette River. In this connection the court quoted with approval from Gould on Waters, as follows:

> "Mr. Gould says: 'Riparian owners upon navigable fresh-water rivers and lakes may construct in shoal water in front of their land, wharves, piers, landings, and booms in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank, and not upon title to the river bed. Its exercise may be regulated or prohibited by the state; but so long as it is not prohibited, it is a private right derived from the passive or implied license by the public. As it does not depend upon title to the soil under water, it is equally valid in the states in which the river beds are held to be public property and in those in which they are held to belong to the riparian proprietors, *usque ad filum aquae.*' Again, he says: 'The legislature may authorize the extension of such structures beyond low-water mark; but if not sanctioned by the legislature, they are illegal, so far as to interfere with or limit the right of navigation': Gould on Waters, § 176."

The court then said:

> "In view of these considerations, the wharf of plaintiffs, *being in aid of navigation, is a legal*

*structure and private property*, which can only be taken for public use according to established law, and with due compensation therefor." 25 Or at 163. (Italics ours.)

The court referred to the statute, now ORS 780.050, authorizing regulation of wharves and to an ordinance of the city providing that "all wharves and piles now erected or driven beyond the lines described in section 1 of this ordinance shall be removed to conform to the above described line within ten years * * *", and apparently considered the ordinance valid. Again, the court quoted from *Parker v. Taylor,* 7 Or 435, as follows:

> " 'Under the provision of the statute,' said Boise, J., 'any person within an incorporated town within this state may build and maintain a wharf from his land at high-water into navigable water, so far as is necessary or convenient to accommodate shipping, if he conforms to the legal restrictions imposed on him by the authorities of the town, and does not impede navigation. Such structures are erected in all commercial towns, and have been recognized as legal structures in all the states': Parker v. Taylor, 7 Or. 446."

The court held that the riparian owners having built wharves pursuant to permission or privilege had acquired vested rights, but here again, the language used must be read in the light of the context. The city was not asserting that plaintiffs' wharf was an obstruction to navigation, but was claiming the right to use plaintiffs' land itself for purposes of bridge construction.

In *Corvallis & Eastern R. Co. v. Benson,* 61 Or 359, 121 P 418, the case involved the question as to the validity of a conveyance of tide and marshlands to the plaintiff railroad company by the state. In discussing

this question the court made the following important pronouncement:

> "It is well settled that the tidelands laid bare, and anon flooded by the sea as it ebbs and flows, became the property of the State on its admission into the Union. In the title thus conferred upon the State, there are two elements—the *jus privatum*, or private right, and the *jus publicum*, or public authority. The former is a species of private property which a state holds in the same way that an individual citizen owns land which he has acquired from the United States by any of the methods provided for the sale of the public domain, or from any private person by purchase and conveyance. This private property in tidelands, the State by its legislative assembly, may grant to any one in any manner, or for any purpose not forbidden by the constitution, and the grantee will thereby take the title described in the grant as absolutely as if the transaction were between individuals; one conveying his private lands to the other. The State, however, cannot abdicate or grant away the other element of its title to tidelands—the *jus publicum*, or public authority over them. This is the dominion of government or sovereignty in the State, by which it prevents any use of lands bordering on the navigable waters within the State which will materially interfere with navigation and commerce thereon. For, by the tenets of the common law, as well as by the terms of the act of Congress of February 14, 1859, c. 33, 11 Stat. 383, admitting Oregon as a state into the Union, the rivers and waters forming a boundary between it and other states 'and all the navigable waters of said State shall be common highways and forever free as well to the inhabitants of said State as to all other citizens of the United States.' " 61 Or at 369.

The court cited with approval *City of Oakland v. Oakland Water Front Co.*, 118 Cal 160, 50 P 277. The Cali-

fornia court in that case held that the state had full power to alienate tidelands, but it added:

> " 'A grant by the state of California, therefore, of mud flats and shoals between high and low tide on the margin of the bay of San Francisco cannot be held to have been in excess of the legislative power, in the absence of any proof that such grant has seriously impaired the power of succeeding legislatures to regulate, protect, improve, or develop the public rights of navigation or fisheries, and in this case it does not appear that the grant to Oakland, as here construed, would have that effect, if transferred to a natural person or private corporation.' " 61 Or at 374.

The court also referred to the case of *People v. Kerber*, 152 Cal 731, 93 P 878, where it was held that title by prescription cannot be acquired as against the *jus publicum* and that the Constitution of the State of California forbade the sale of tidelands situated within two miles of an incorporated town.

We are not here concerned with the question whether the bed of a navigable stream between high and low water may be acquired adversely to the claim of the state. We are concerned only with the alleged right to obstruct navigation regardless of ownership or non-ownership of land under the water.

In *Pacific Elevator Co. v. Portland,* supra, 65 Or 349, 133 P 72, the contest was between the plaintiff and the city, both claiming the right to erect a wharf in front of plaintiff's property. After holding, as we have indicated supra, that the plaintiff owned the land between the high and low water lines, the court considered the effect of such ownership upon the right of navigation and held that the plaintiff's right was subject to paramount right of navigation and "to such reasonable regulation as the state through its munici-

pality may prescribe." (65 Or at 402.) The court quoted with approval from *Hinman v. Warren,* supra, to the effect that the state " 'has, however, no authority to dispose of its tide lands in such a manner as may interfere with the free and untrammeled navigation of its rivers * * *. The grantees of the state took the land subject to every easement growing out of the right of navigation *inherent* in the public.' * * *'' (Italics ours.) 65 Or at 395. In the Pacific Elevator case it was held that to allow the Dock Commission of the City of Portland to erect a wharf on and in front of plaintiff's premises would amount to a taking of private property without compensation. But in that case the city was seeking to occupy plaintiff's land with a wharf in aid of navigation. No one claimed or was accorded a vested right to obstruct navigation.

In *Gatt v. Hurlburt,* supra, 131 Or 554, 284 P 172, the issue resembled the one in the case at bar in that it related to lands below low-water line. The Security Savings and Trust Company was owner of riparian land which extended to low-water mark on the Willamette River. The plaintiff claimed title by adverse possession to a portion of the bed of the river in front of that land. The court said:

"* * * At the same time that this state was admitted into the Union it acquired title, not in a proprietary capacity but in its sovereign capacity, that is to say as trustee for the public, to all of the bed of navigable streams within its borders. These it could not sell or dispose of or grant the right to make any use of them which would impair or impede navigation. It could and did grant the right to the owners of the land lying above the low water mark to extend wharves between the low water mark and the navigable parts of the river, but this was wholly in aid of commerce and to afford access for

the loading and unloading of cargoes, and the transportation of passengers, and other articles of commerce.

\* \* \* \* \*

"\* \* \* The title to the soil underlying the water, that is to the bed of the river itself, is vested in the state and is held by the state in its sovereign capacity as trustee for the public and the adverse possession of no person however long continued can divest it of its title." 131 Or 561, 562.

On petition for rehearing the plaintiff cited *Montgomery v. Shaver,* wherein it was recognized that by the construction of a wharf which did not impede navigation but which did encroach on the adjoining owner's rights, title might be obtained by adverse user *as against the adjoining owner.* The court said:

"\* \* \* But if, as contended for in the instant case, this plaintiff, without the consent of the upland owner, has constructed in front of the owner's property between the low water mark of such property and the navigable waters of the Willamette river, 'moorage dolphins, wharfage structures, docks and landing places for vessels and water craft,' he had no legislative authority for doing so and the construction and maintenance of them constituted a public nuisance. He was exercising no privilege or right conferred upon him by statute and was not acting with the consent of the owner of the adjacent upland and, hence, he could acquire no right by prescription to maintain the nuisance as against the state nor to maintain it against the upland owner unless it worked some special and peculiar injury to such owner not shared by the public. Even as against the upland owner, it seems to be very doubtful whether an obstruction to navigation for any length of time will bar such owner from maintaining an action to have the same abated for, as said by Judge Cooley: 'if the nuisance consisted in an obstruction to navigation, no one could

maintain a personal action until he had occasion to make use of the public right and found it obstructed; * * * On the whole the better doctrine would seem to be, that the acquisition of rights by prescription can have nothing to do with the case of public nuisances, either when the State or when individuals complain of them'; Cooley on Torts (2d Ed.) p. 731.

"* * * we held, and we think properly, that for plaintiff to have acquired title by adverse possession under the circumstances alleged by him he must have acquired it against the state, if against. any one, which obviously he could not have done for 'no lapse of time can confer the right to maintain a nuisance as against the state': Cooley on Torts (2d Ed.), p. 730." *Gatt v. Hurlburt*, 132 Or 415, 418, 419, 286 P 151.

We will now state the conclusions to be drawn from the authorities.

The ordinance of the Port in establishing a harbor line landward of the old United States Line was valid. By that ordinance and by the resolution of 9 June 1952 it was established, prima facie at least, that structures maintained riverward of the Port Harbor Line constituted obstructions to navigation and public nuisances. *Portland v. Montgomery*, supra. The evidence overwhelmingly supports the same conclusion. The facilities maintained by the defendants are not wharves and are not in aid of navigation. *Harris v. St. Helens*, 72 Or 377, 388, 143 P 941. We think that even in the case of wharves, the provisions of ORS 780.050, supra, contemplate that *applications* shall be made before a wharf is constructed within any city or town. No application has ever been made to port or city for construction of any facility except the floating shop, the exact location of which is undisclosed. We have seen some language which implies that the maintenance

of a substantial wharf constructed out to an established harbor line might become a vested right even though no application had been made under ORS 780.050. This would seem to contravene the language of the statute if the wharf is within a town. We deem it unnecessary to decide the question. The maintenance of these facilities and the piling to which they are attached are not of a substantial or permanent character. They interfere with the *jus publicum* and effectively prevent the navigation by vessels and small boats of a large area of water lying below low-water line.

This issue cannot be determined by an "ivory tower" consideration of abstract rights. The shipping and industry of a great city are involved. Ports have the right to deepen the water by dredging the bed of navigable streams riverward of low-water line in aid of navigation. In view of the immense increase in use of the Swan Island Basin by great ships, we would be blind to reality and to public interest if we were to lay down a rule which would limit the present and future rights to use of navigable water to the uses which were adequate in days long gone by. That defendants have by sufferance been able to exclude the public from its inherent rights of navigation, and have profited financially thereby, does not entitle them to claim a vested right to continue so to profit. We find no case in which a vested right has been recognized, save in the case of *wharves constructed and maintained in aid of navigation.* Furthermore, we have been cited to no case in which the court has held that there is a vested right to maintain even a wharf which was once an aid to navigation but has since become a menace by reason of changed conditions. Defendants cite *Yates v. Milwaukie,* 10 Wall 497, 19 L ed 984, as such a case.

But there "There was no evidence to show that the wharf was an actual obstruction to navigation or was in any other sense a nuisance." The court simply held that the city could not by its declaration make a structure a nuisance which was not one in fact.

In *Greenleaf Johnson Lumber Co. v. Garrison,* 237 US 251, 59 L ed 939, the United States Supreme Court distinguished the Yates case on the basis above indicated. The cases were reviewed and the court held that the power of Congress extends to the whole expanse of a navigable stream and is not dependent upon the depth or shallowness of the water and that one who had constructed a lawful wharf extending only to a duly established harbor line had *no right to compensation* when a new harbor line was established by the Secretary of War, beyond which the wharf extended. It was held that the Secretary of War had power to remove structures which extended beyond the new line. If such removal of a portion of a wharf without compensation was not a violation of the Fifth amendment when done by the United States, why should it be a violation of the Fourteenth Amendment when done by the state? See also *Shively v. Bowlby,* 152 US 1, 38 L ed 331; *Illinois Central R. Co. v. Illinois,* 146 US 387, 36 L ed 1018; *Scranton v. Wheeler,* 179 US 141, 45 L ed 126.

■ The decision by the trial court when made was based upon a sound analysis of law and facts and was correct. Having concluded that the defendants had no vested rights riverward of low-water line, we are now forced to consider whether they acquired rights which cannot be taken without compensation under the provisions of ORS 778.090 (2), supra, which was enacted after the circuit court had entered its decree herein and after appeal had been taken to this court.

Before considering the charge of unconstitutionality which is leveled against the statute, let us consider its construction. The statute applies in "all cases of adjoining owners, where it shall be necessary to widen the general channel or improve the navigation of the [Willamette] river * * *." ORS 778.090 (2). Defendants' assertion that this statute is applicable carries with it the confession that such widening or improvement is "necessary." This section purports to be a limitation on the governmental powers vested in the Port by ORS, namely, the power to control the Willamette River; to make and change wharf lines; to make rules concerning navigation; and for removal of obstructions "as the port deems convenient, requisite or necessary * * *." ORS 778.085 (3).

■ ORS 778.090 (2) is a statute in derogation of sovereignty and common right and purports to be a grant to private parties of a right of compensation which would not otherwise exist. Therefore the rule of strict construction applies. 50 Am Jur, Statutes, §§ 424 and 425. The statute provides that in all cases where it is necessary to widen or improve channel or navigation "by requiring the removal or destruction of moorage facilities for houseboats, boathouses or pleasure craft * * * said adjoining owners or others owning such moorage facilities shall be reasonably compensated for the removal or destruction of such moorage facilities * * *." This statute bears upon its face convincing evidence that it was drawn for the pecuniary benefit of these defendants. It is special, disguised as general, legislation, to evade the decree of the circuit court in this case. Whether valid or not, such legislation does not commend itself to this court, or move us to liberal construction.

Our first observation is that the statute purports to

require compensation for "removal or destruction" of such moorage facilities. The Port has forbidden the defendants to "maintain" such facilities and the circuit court has enjoined the maintenance of houseboats and facilities. The facilities in question are described in the answer as "consisting of piling, dolphins, board walks, boat hoists, piping, etc., located on said defendants' land, and extending out to the navigable waters * * *." In the first place, defendants own no "land" below low water. Secondly, neither the ordinances of the Port nor the court injunction requires any destruction of facilities unless piling would be destroyed by removal thereof. At most, the statute requires compensation for the cost of removal of the facilities which can be removed, or of destruction of any that must be destroyed. Thirdly, the statute imposing the asserted duty of compensation refers to moorage facilities *for* houseboats, and not to the houseboats themselves. These houseboats are actually located riverward of both the United States Harbor Line and the Port Line. The defendants never had any right to maintain them there, and the statute gave no right to compensation for their removal as directed by the trial court.

The next portion of the statute on which defendants rely provides for compensation where it is necessary to improve navigation "by establishing or reestablishing wharf lines that have the effect of destroying or impairing the riparian rights of said adjoining owners * * *." ORS 778.090 (2) supra. This portion of the act applies only if riparian rights have been destroyed or impaired. The riparian rights of defendants did not include the right to obstruct navigation, and the removal of such obstructions which have been declared and are found to constitute a pub-

lic nuisance will not "destroy or impair" defendants' riparian rights. The decree of the circuit court expressly recognized defendants' continued right of access to the water.

■ Applying the rule of strict construction as we are required to do, we hold that as applied to the defendants, the subject-matter of the statute is the removal or destruction of moorage facilities for houseboats, boathouses or pleasure craft. A "facility" for mooring a pleasure craft, houseboat or boathouse certainly cannot be construed as including the craft or house so moored. This defintion of facility finds support in defendants' brief, where they say: "These moorage facilities consist of piling and floating walkways with slips to accommodate houseboats as well as tugs and pleasure craft. These facilities also include a 'six pile' boat hoist and a floating marine repair shop. * * *"

■ Our next question is; for what shall the defendants be reasonably compensated? The answer is that the owners "owning such moorage facilities shall be reasonably compensated *for the removal or destruction of such moorage facilities*", and they "*shall not be required to remove or destroy said moorage facilities in absence of reasonable compensation therefor.* * * *" ORS 778.090. (Italics ours.) We have held that defendants did not acquire any vested right to maintain these facilities where located. We have not held that they are not owners of them. Obviously, the boat hoist and floating marine repair shop are owned by defendants, and the houseboats are owned either by defendants Reeder or by others renting space for them. These facilities may be removed by the owners. The Port is not seeking to condemn and take title to any facilities. It seeks only to cause their removal. It follows

that since the defendants have no vested right to occupy the area with obstructions to navigation, there is no vested right of occupancy to be condemned, and since the defendants' ownership of the physical and removable facilities is clear, and the Port does not seek to take them, there is no occasion for the exercise of a right of eminent domain as to them. Any other construction of the statute would raise serious questions. It could hardly be argued that the Legislature intended to create a property right in the nature of a vested privilege or franchise to maintain a public nuisance obstrucing navigation, in order to create a duty to condemn it. This, however, does not require us to hold that the Legislature did not intend to require compensation for something. It is not the title to these facilities which is taken. It is the removal or destruction of them for which the Legislature has provided reasonable compensation. This would imply compensation for the reasonable cost of removal if done at the expense of defendants, and outright payment for any facilities destroyed. The statute provides no compensation for removal of the floating houseboats, boathouses or pleasure craft. In fact, defendants tell us that 11 of the 40 houseboats which were moored at Aviation Moorage were not in front of defendants' lands, but fronted on lands of the University of Portland. As to these, the defendants have no color of right to their maintenance as obstructions to navigation.

It is apparent that defendants anticipated that a distinction would be made between compensation for removal of facilities and compensation for loss of the claimed right to maintain the houseboats at the moorage. They say:

"The decree so far as it relates to houseboats is as repugnant to the Legislative mandate as is

the decree directed toward the moorage facilities. To say that a moorage facility built and designed for the accommodation of houseboats can remain but cannot be used for the only purpose intended is to destroy the moorage facility by judicial fiat as effectively as burning or sinking it. To hold that REEDERS have a right to maintain their moorage facility in the waters fronting upon their property and then to hold they cannot use such facility for the only purpose intended is to impair their riparian rights and circumvent the Legislative mandate as effectively as if this Court ignored the 1953 Legislature in the first instance.''

The error in the foregoing argument lies in the fact that we do not hold that defendants must remove the houseboats, but that they can maintain the facilities. On the contrary, assuming that the statute is valid, we hold that they must remove the houseboats, and may also be required to remove or submit to removal of the facilities on compliance with the duty to compensate as indicated. Only by thus construing the statute do we avoid the impact of the Port's contention that the statute amounts to an indirect attempt to grant to private individuals the state's paramount authority over navigation—an authority which it cannot relinquish.

The plaintiff contends that ORS 778.090 operates purely *in futuro* and that the ordinance fixing a harbor line and the resolution declaring the houseboats a nuisance were *fait accompli*. The difficulty is that the removal pursuant to the ordinance was not *fait accompli*. As we have said, the statute bears every indication of having been passed with this very case in mind. True, it operates prospectively, but as such it applies to a removal or destruction of physical facilities yet to be effected. The Port does not seriously

challenge the rule that in suits for injunction, when the law is changed by the Legislature between the issuance of the decree in the lower court and the decision of the appeal, the Supreme Court will give effect to the new statute. See *Pennsylvania v. The Wheeling & Belmont Bridge Co.*, 59 US 421, 15 L ed 435; *American Steel Foundries v. Tri-City Council*, 257 US 184, 66 L ed. 189; *Spexarth v. Sherman*, 93 Or 254, 183 P 23, 111 ALR 1328.

The remaining question is whether the statute thus narrowly construed is unconstitutional. While the question is not free from doubt, we cannot say that it is clearly invalid.

The Port contends that ORS 778.090 (2) is unconstitutional because it attempts to grant to private individuals, by indirection, the state's paramount authority over navigation. But we recognize that the state still has paramount authority over navigation and may remove houseboats and facilities. The only question is whether in doing so it is required to compensate for costs of removal or destruction of physical facilities. Clearly, there is no right of compensation based on the invalid claim of right to occupy the area with obstructions.

■ The Legislature has a large discretion in matters of this kind. It appears that the immense increase in the use of the basin by great ships has resulted in a need for more space for maneuvering than was once necessary. We may assme that upon removal of the obstructions the area of practicable navigability will be widened by dredging as need arises, and defendants will enjoy their riparian rights. The facilities of these defendants were placed in the river many years ago, under conditions differing materially from those now existing. They now constitute a public nuisance. When

first constructed this may not have been true. We may assume that when the facilities were first affixed to the bed of the river, it was done in good faith, and that they were acquired by defendants in good faith. There is nothing to show the contrary. Why then cannot the Legislature require of the Port that the cost of removal of facilities or the value of the physical property destroyed, if any, shall be borne by the Port. The Port is the creature of legislation. Its powers are defined thereby, and the power which grants power may impose limitations on the mode of exercise thereof, provided it does not amount to an abrogation of the power and duty to protect the *jus publicum* from impairment.

In *People ex rel. Douglas v. Barrett,* 370 Ill 464, 19 NE2d 340, the court referred to the express constitutional provision which "limits the Legislature to appropriations for public purposes * * *." Illinois Constitution, Article IV, § 20. It then said:

"* * * but the question of what is a public purpose is primarily for the legislature to determine. Judicial interference with the legislature is not warranted, unless there has been a clear abuse of power. Robbins v. Kadyk, 312 Ill. 290, 143 N.E. 863. As was said by the Supreme Court of the United States in Missouri, Kansas & Texas Railroad Co. v. May, 194 U.S. 267, 24 S.Ct. 638, 639, 48 L.Ed. 971: 'Great constitutional provisions must be administered with caution. * * * It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' Whether an appropriation is for a public purpose depends on the particular facts in each case." 19 NE2d at 341.

The court continued:

"* * * A moral or equitable claim against the State may arise out of many varying circum-

stances. Thus, public money may be lawfully appropriated to pay for injury to land by a public improvement, although no liability existed when the injury occurred (In re Borup, 182 N.Y. 222, 74 N.E. 838) or to pay a bounty which had been earned but not paid when the statute authorizing the payment of the bounty was repealed (United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215) or to grant bonuses to soldiers. (Hagler v. Small, supra.) In the last named case, at page 478, 138 N.E. at page 856, we quoted from United States v. Realty Co. supra, as follows: 'The power to provide for claims upon the state founded in equity and justice has also been recognized as existing in the state governments. For example, in Guilford v. Chenango County Supervisors, 13 N.Y. 143, it was held by the New York Court of Appeals that the Legislature was not confined in its appropriation of public moneys to sums to be raised by taxation in favor of individuals to cases in which the legal demands existed against the state, but that it could recognize claims founded in equity and justice in the largest sense of these terms or in gratitude or in charity. Of course, the difference between the powers of the state Legislatures and that of the Congress of the United States is not lost sight of, but in relation to the power to recognize and to pay obligations resting only upon moral considerations or upon the general principles of right and justice, the federal Congress stands upon a level with the state Legislature.' We further said, at page 479, 183 N.E. at page 856: 'It is of the essence of a moral obligation that it arise out of a state of facts appealing to a universal sense of justice and fairness, though upon such facts no legal claim can be based. The state may be said to owe a moral debt to an individual when his claim grows out of the principles of right and justice. When it is of such a nature as to be binding on the conscience or honor of an individual, it may be said to be based upon considerations of a moral or honorary nature of which

the state may take cognizance. Payments to individuals in the nature of a gratuity yet having some features of a moral obligation to support them have been made by Congress since the foundation of the government.' See, also, Woodall v. Darst, 71 W.Va. 350, 77 S.E. 264, 265, 80 S.E. 367, 44 L.R.A., N.S., 83, 87, Ann.Cas. 1914B, 1278; Munro v. State, 223 N.Y. 208, 119 N.E. 444; 25 R.C.L. 402." 19 NE2d at 342.

See, also, *Gross v. Gates,* 109 Vt. 156, 194 A 465; *State ex rel. Wharton v. Babcock,* 181 Minn 409, 232 NW 718; *Fairfield v. Huntington,* 23 Ariz 528, 205 P 814; *Urquhart v. State,* 180 Ark 937, 23 SW2d 963. And see concurring opinion in *Woodall v. Darst,* 71 W Va 350, 77 SE 264 (same case, 71 W Va 350, 80 SE 367). See also, Note, 172 ALR 1408.

 In the case at bar, although we may infer a relationship between the plight of the defendants and the act of the Legislature, we must also presume the good faith of the latter. The statute is drawn in general terms and is to be applied "in all cases of adjoining owners * * *." On its face it is not an appropriation of money for the specific benefit of defendants, but is rather a statement of the conditions under which the Port shall proceed in removing moorage facilities. The statute approaches the borderline of unconstitutionality but is not so clearly bad as to warrant the judiciary in striking it down.

 We are not impressed by the argument that the statute is violative of Oregon Constitution Article I, § 20. The Legislature created the Port of Portland and may amend its charter powers without also amending every other Port charter where conditions may be materially different. As narrowly construed we hold that ORS 778.090 is not so indefinite as to be unenforceable.

For the reasons set forth we cannot wholly affirm the decree of the learned trial judge, though it was without error when entered.

The decree will be, and is, modified to provide that the defendants Reeder are enjoined and restrained from mooring houseboats outside of the Port harbor line, or permitting others to do so or renting moorage space for that purpose. Said defendants are restrained from building any structures outside of said harbor line. All of the defendants are enjoined and restrained from maintaining or mooring houseboats outside of said harbor line at Reeder's Moorage. All such houseboats shall be removed by the respective defendant owners thereof within 30 days from the date of this decree. In the event of failure to remove any such houseboat within the time specified, the Port may proceed to remove the same without liability to any defendant. Defendants Reeder are further enjoined and restrained from maintaining any of the moorage facilities outside of the harbor line established by the Port.

The cause is remanded to the circuit court with directions to ascertain and fix a reasonable time within which defendants shall remove said "facilities". The circuit court will retain jurisdiction of the cause and upon the removal of said facilities will fix and award to the defendants Reeder reasonable compensation measured by the cost of removal thereof and reasonable compensation for any facilities not removable which are destroyed pursuant to this decree. In the event that the defendants Reeder fail or refuse to remove all said facilities within the time fixed by the circuit court, the Port may, at its own expense, remove such facilities as are removable and tender them to defendants Reeder and if any such facilities be de-

stroyed in the removal thereof the Port shall pay to defendants the value of facilities so destroyed.

The decree does not limit the enjoyment by defendants Reeder of the ordinary riparian rights of access to water.

Neither party shall recover costs in this court.